IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


STORM PATRICK WOOD,
      Petitioner,

vs.                           Case No.:  5:17cv163/MCR/EMT

SECRETARY FLORIDA DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____/

## **REPORT AND RECOMMENDATION**

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 23).  Petitioner filed a reply (ECF No. 31).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the

court show that Petitioner is entitled to a conditional grant of the writ on one of his

claims.

I.      BACKGROUND AND PROCEDURAL HISTORY

        The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 23).[1]  Petitioner was charged in the Circuit

Court in and for Bay County, Florida, Case No. 2008-CF-3762, with one count of

Driving Under the Influence ("DUI") Manslaughter (Count I), one count of Felony

Driving While License Suspended or Revoked ("DWLS") Causing Death (Count II),

and one count of Aggravated Fleeing to Elude a Law Enforcement Officer Causing

Death (Count III) (Ex. A at 29–30).  Following a jury trial, Petitioner was found

guilty as charged of Counts I and II (Ex. A at 78–80, Exs. E, F, G).  On August 11,

2009, the trial court adjudicated Petitioner guilty of DUI Manslaughter and Felony

DWLS (Ex. A at 86–90).  Petitioner was sentenced to fourteen (14) years in prison

on Count I, with pre-sentence jail credit of 264 days, and five (5) years of probation

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 23).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

on Count II, to run consecutive to the prison sentence on Count I (Ex. A at 86–90, Ex. D).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D09-4281 (Exs. H, I).  The First DCA affirmed the judgment per curiam without written opinion on September 1, 2010, (Ex. J).  *Wood v. State*, 43 So. 3d 699 (Fla. 1st DCA 2010) (Table).  The mandate issued September 17, 2010 (*id.*).

On November 16, 2010, Petitioner filed a motion to modify/reduce sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. K at 120–23).  The state circuit court summarily denied the motion on November 22, 2010 (*id.* at 124).

On November 22, 2011, Petitioner, through counsel, filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. K at 128–47).  Petitioner filed an amended motion on March 9, 2012 (*id.* at 156–77), and a second amended motion on April 9, 2012 (*id.* at 178–200).  In an order rendered April 11, 2013, the state circuit court struck four of Petitioner's claims as facially insufficient, without prejudice to Petitioner's filing an amended motion within thirty (30) days (Ex. N at 642–43).  Petitioner filed a third amended motion on May 13, 2013, and an amended version of the same motion (to cure an

oath deficiency) on May 30, 2013 (*id.* at 695–717).  The state circuit court summarily denied the third amended Rule 3.850 motion on November 25, 2013 (*id.* at 720–35). Petitioner appealed the decision to the First DCA, Case No. 1D14-95 (Ex. O at 861– 62, Ex. R).  The First DCA affirmed the circuit court's denial of Grounds 2 through 7, but reversed the court's decision as to Ground 1, and remanded the case for an evidentiary hearing on that claim (Ex. W).  *Wood v. State*, 143 So. 3d 493 (Fla. 1st DCA 2014).  The circuit court held an evidentiary hearing on Ground 1 (Ex. Q).  The court denied Ground 1 in an order rendered on July 10, 2015 (*id.* at 923–34). Petitioner appealed the decision to the First DCA, Case No. 1D15-3702 (Ex. X). The First DCA affirmed per curiam without written opinion on November 9, 2016, with the mandate issuing February 8, 2017 (Ex. AA).  *Wood v. State*, 208 So. 3d 1164 (Fla. 1st DCA 2016) (Table).

On February 13, 2017, Petitioner filed a motion to correct illegal sentence in the state circuit court, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. BB at 1–3).  The circuit court summarily denied the motion in an order rendered on March 6, 2017 (*id.* at 17).  Petitioner appealed the decision to the First DCA, Case No. 1D17-1191 (*id.* at 18).  The First DCA affirmed per curiam without written opinion on June 7, 2017 (Ex. CC).  *Wood v. State*, 227 So. 3d 575 (Fla. 1st DCA 2017) (Table).  The mandate issued July 6, 2017 (*id.*).

Petitioner filed the instant federal habeas action on June 16, 2017 (ECF No.

1).

II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
>
>> **(1)** resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established
>> Federal law, as determined by the Supreme Court of
>> the United States; or
>>
>> **(2)** resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the evidence
>> presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached by
> this court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas

court may grant the writ if the state court identifies the correct
governing legal principle from this Court's decisions but unreasonably
applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal

law," namely, "the governing legal principle or principles set forth by the Supreme

Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538

U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly

established" only when a Supreme Court holding at the time of the state court

decision embodies the legal principle at issue.  *Thaler v. Haynes*, 559 U.S. 43, 47,

130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S.

Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly

established Federal law for purposes of § 2254(d)(1) includes only the holdings, as

opposed to the dicta, of this Court's decisions." (internal quotation marks and

citation omitted)).

After identifying the governing legal principle(s), the federal court determines

whether the state court adjudication is contrary to the clearly established Supreme

Court case law.  The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only

if either the reasoning or the result contradicts the relevant Supreme Court cases.

*See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).  Where

there is no Supreme Court precedent on point, the state court's conclusion cannot be

contrary to clearly established federal law.  *See Woods*, 135 S. Ct. at 1377 (holding,

as to claim that counsel was per se ineffective in being absent from the courtroom

for ten minutes during testimony concerning other defendants:  "Because none of

our cases confront the specific question presented by this case, the state court's

decision could not be contrary to any holding from this Court." (internal quotation

marks and citation omitted)).  If the state court decision is contrary to clearly

established federal law, the federal habeas court must independently consider the

merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127

S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next

determines whether the state court "unreasonably applied" the governing legal

principles set forth in the Supreme Court's cases.  The federal court defers to the

state court's reasoning unless the state court's application of the legal principle(s)

was "objectively unreasonable" in light of the record before the state court.

*Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct.

2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme

Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning
> their decisions only when there could be no reasonable dispute that they
> were wrong.  Federal habeas review thus exists as "a guard against
> extreme malfunctions in the state criminal justice systems, not a
> substitute for ordinary error correction through appeal." *Harrington*,
> *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on

the merits in state court where that adjudication "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable

determination of the facts" standard is implicated only to the extent the validity of

the state court's ultimate conclusion is premised on unreasonable fact finding.  *See*

*Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable

application" clause, the federal court applies an objective test.  *Miller-El v. Cockrell*,

537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state

court decision based on a factual determination "will not be overturned on factual

grounds unless objectively unreasonable in light of the evidence presented in the

state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the

record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

    A.    <u>Ground One: "Defense counsel rendered ineffective assistance of counsel by failing to retain an independent accident reconstruction expert."</u>

The factual basis for Petitioner's charges (DUI Manslaughter and DWLS Causing Death) was that Petitioner was driving a motorcycle when it crashed, killing his passenger, Robin Arnett (Ex A at 29–30). Petitioner alleges the State presented circumstantial evidence that he was the driver of the motorcycle (ECF No. 1 at 5–

6).[2] He alleges his theory of defense was that Ms. Arnett was driving the motorcycle at the time of the accident (*id*. at 6). Petitioner contends defense counsel was ineffective for failing to present testimony from an accident reconstruction expert (*id.*). Petitioner alleges he presented testimony from an accident reconstruction expert at the post-conviction evidentiary hearing (*id.*). Petitioner alleges the expert testified that he would have testified at trial that Ms. Arnett was driving the motorcycle (*id.*). Petitioner alleges defense counsel's decision not to retain an expert was unreasonable (*id.*). Petitioner alleges the result of trial would have been different if trial counsel had presented testimony from an expert (*id.*).

Respondent asserts, without conceding or waiving an exhaustion defense, that it "appears" Petitioner exhausted this claim by presenting it as Ground 1 of his third amended Rule 3.850 motion (ECF No. 23 at 27 n.4). Respondent contends the state court adjudicated the merits of the claim (*id.* at 17–28). Respondent contends Petitioner has not shown that the state court's denial of the claim was contrary to or an unreasonable application of clearly established federal law, or that it rested upon an unreasonable determination of the facts in light of the evidence presented (*id.* at 28–30).

---

[2] When referencing the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system.

1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).   To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms."   *Strickland*, 466 U.S. at 688–89, 691.   "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v.*

*Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317).

Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is

also constitutionally protected—and would restrict the wide latitude counsel have in

making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244

(11th Cir. 2001)).

Professionally competent assistance includes a duty to conduct a reasonable

investigation.  *See Strickland*, 466 U.S. at 690–91.  The Supreme Court has

emphasized that only when counsel's choices are made after a "thorough

investigation of law and facts relevant to plausible options" are those choices

"virtually unchallengeable." *Id.* at 690.  When, however, "strategic choices [are]

made after less than complete investigation [they] are reasonable precisely to the

extent that reasonable professional judgments support the limitations on

investigation." *Id.* at 690–91.  Thus, at bottom, "counsel has a duty to make

reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary.  In any ineffectiveness case, a particular decision not to

investigate must be directly assessed for reasonableness in all the circumstances. . .

." *Id.* at 691.  This means that when a court assesses the attorney's decision not to

investigate, it "must consider . . . whether the known evidence would lead a

reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting

*Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting <u>Strickland</u>'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland*

was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at

788.  As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both
> "highly deferential," and when the two apply in tandem, review is
> "doubly" so.  The *Strickland* standard is a general one, so the range of
> reasonable applications is substantial.  Federal habeas courts must
> guard against the danger of equating unreasonableness under *Strickland*
> with unreasonableness under § 2254(d).  When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.  The
> question is whether there is any reasonable argument that counsel
> satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 1 of his third amended Rule 3.850

motion (Ex. N at 699–700).  The circuit court held an evidentiary hearing on this

claim (Ex. R).  The circuit court adjudicated Ground 1 as follows:

**Ground One of Amended Motion for Postconviction Relief**

> According to the Defendant, at trial the State's theory was that
> the Defendant was driving the motorcycle at the time of the accident,
> whereas the defense's theory was that the victim Arnett was driving the
> motorcycle.  He complains that while the State presented evidence to
> support its theory, trial counsel failed to present compelling evidence
> to support his defense, and, more specifically, failed to present an
> accident reconstruction expert who would have refuted the testimony
> of the State witnesses, and opined that the victim was the driver.  The
> Defendant alleges that had trial counsel sought to retain an accident
> reconstruction expert, such an expert would have been willing and
> available to testify at trial.  He further alleges that he has since retained

accident reconstruction expert John Buchanan, who, after conducting an independent reconstruction of the accident, concluded in his report that the victim was driving the motorcycle at the time of the accident. During postconviction discovery, the Defendant produced a copy of Buchanan's report.[FN 1]   *See* State's Motion for Postconviction Discovery (with attached report).   The Defendant claims that trial counsel's failure in this respect was deficient and resulted in prejudice for purposes of *Strickland v. Washington*, 104 S. Ct. 2052 (1984).

> [FN 1:   His Amended Motion made reference to Buchanan's report but did not attach a copy of it.]

## Evidentiary Hearing

At the evidentiary hearing, the Defendant presented the testimony of Buchanan, who was retained to conduct an independent accident reconstruction analysis for the Defendant's case.  (ET 8).  In conducting his analysis, he reviewed the traffic homicide report, photographs from the scene of the accident, deposition transcripts, and the trial transcripts.  (ET 9).[FN 2]  He was tendered as an expert at the evidentiary hearing by the Defendant's postconviction counsel without objection from the State.  (ET 8).

> [FN 2:   Citations to the transcript of the evidentiary hearing will appear as "ET," followed by the appropriate page number, *e.g.*, (ET 3).]

Buchanan first testified with respect to some of the inconsistencies in Sergeant Guilford's testimony he had listed in his report.  Buchanan noted that at trial, Sergeant Guilford had stated that he initially observed two motorcycles (including the Defendant's) traveling between 90 to 100 miles per hour.  (ET 10).  However, Buchanan noted that 100 miles per hour is about "146 feet per second," and that Sergeant Guilford had said he was 150 yards away at the time.  (ET 10).  Thus, Sergeant Guilford only would have had "one to two-tenths of a second" to observe them and "it was at night time."  (ET 10).  In light of these factors, Buchanan opined that it would have been

"virtually impossible" for Sergeant Guilford to see how many persons were on the motorcycles or which lanes they were in. (ET 11). Also according to Buchanan, Sergeant Guilford initially stated that the motorcycle he was following was doing "bumper cars" to pass other motorcycles, but he later changed his testimony at trial and stated that the motorcycle in question merely went in between the other motorcycles. Moreover, Sergeant Guilford also changed his testimony about how long it took him to arrive at the scene of the crash because, according to Buchanan, Sergeant Guilford was trying to make it look like he was "a lot closer" to the Defendant's motorcycle than he actually was. (ET 21). In this connection, Buchanan also pointed to inconsistencies between Sergeant Guilford's testimony and the CAD notes, which for him indicate that he did not "roll up on this crash." (ET 22).

Next, Buchanan turned his attention to Corporal Chapman's investigation of the crash. Buchanan stated that the motorcycle should have been examined to determine what gear it was in at the time of the crash, but opined that the motorcycle was in first gear at the time. (ET 17). Buchanan went on to explain that the motorcycle being in first gear would be consistent with the victim Arnett having been the driver, as with her lack of knowledge "she would not be able to shift." (ET 18). Buchanan also took issue with Corporal Chapman's measurements and calculations in reconstructing the crash. (ET 27, 28).

Finally, Buchanan testified that based on his review of the evidence in the instant case, it was his opinion that the victim Arnett was driving the motorcycle at the time of the accident and that the Defendant was the passenger. He explained:

> At the time that [the motorcycle] struck the sidewalk and went down the passenger, the male passenger was ejected at that point as the bike went down and he took a different departure angle, he did not strike the sign that she and the motorcycle struck. She is holding on to the bars as the bike goes down, the front of the bike, the front left of the bike is where we have all the damage that struck the sign.

She's holding onto the bars, she and the motorcycle strike
the sign.  That's why she didn't go as far as he did, he
didn't hit anything.

(ET 23–24).  Buchanan concluded as follows:

> [W]hen the bike went down he was ejected immediately
> because the passenger has nothing to hold onto on these
> [sic] type of bikes so they're just back there with their arms
> flailing.  So as soon as the bike goes down he goes off.
> Driver[s have] their hands gripped around the bars and
> their legs as they go down around the tank so they're going
> to stay with the bike a lot longer.  [The Defendant] was
> closer to the bike because he didn't strike the sign.  The
> bike ricocheted off and the reason he wasn't right up with
> the bike because the coefficient of friction for the bike is
> less than a tumbling body is.  A tumbling body decelerates
> faster than a bike sliding on its plastic.  So a bike is going
> to go further. Everything when they go down is moving at
> the same speed.  And that is just the drag factors or objects
> that they strike that changes their distance that they're
> going to travel.  So she was with the bars and the front of
> the bike hit, in my opinion, one hundred percent consistent
> that she was holding onto the bars and was the driver.

(ET 29–30).

On cross-examination, the State questioned Buchanan about the
alleged inconsistencies in Sergeant Guilford's testimony.  For many of
the alleged inconsistencies, the State was able to get Buchanan to
acknowledge that trial counsel McCarthy addressed them, and on
several occasions he conceded that she did not need the assistance of
an accident reconstruction expert to point them out for the jury.  (ET
32–45).  The State also cross-examined Buchanan on his opinion that
the victim Arnett was the driver.  Buchanan had stated in his report that
a driver of a motorcycle is going to stay with the motorcycle a lot longer
than the passenger when it goes down because the driver is holding on

to the handlebars and the passenger is not.  When the State pointed out on cross that the Defendant ended up further down the road than the victim, which would be consistent with him having been the driver, Buchanan stated that his "departure angle" was consistent with him not hitting anything and getting "ejected immediately" when the motorcycle hit the curb, and the victim not getting ejected and staying with the bike longer until she hit the street sign.  (ET 49–50).  Buchanan explained that the Defendant's "departure angle" was based on where he hit the sidewalk and his final rest position; in turn, the Defendant's final rest position was based on Buchanan's opinion that the Defendant would not have been not able to move after the crash in light of the injuries he had sustained.  (ET 51).  However, Buchanan conceded that he is not a doctor who could give a medical opinion on whether he could have moved.  (ET 53, 54).  Buchanan also conceded that both the left handlebar and the Defendant's left wrist were broken.  (ET 54–55).  As for the victim's injuries, Buchanan acknowledged that she was cut up the middle by the street sign, but claimed that that was not as a result of getting ejected and flying into the street sign, but rather as a result of her "sliding along the ground with the bike down" and being "directly behind the bike, sliding, as she's got the bars."  (ET 55).

The State then presented the testimony of the Defendant's trial counsel McCarthy at the evidentiary hearing.  The State questioned her about every alleged inconsistency in Sergeant Guilford's testimony that Buchanan had listed in his report, except for the last one.[FN 3]  The first inconsistency involved Sergeant Guilford's original observation of the Defendant's motorcycle, in which he only saw it for a "split second" at a distance of 450 feet and at night, but was still able to estimate its speed as 90–100 m.p.h., and to determine that a female was a passenger on the Defendant's motorcycle as he could see her hair in the wind.  However, McCarthy testified at the evidentiary hearing that on cross-examination she asked him "a lot of questions about that," and further indicated that she did not need the assistance of an accident reconstruction expert to cross-examine him with regard to this inconsistency.  (ET 61).

[FN 3:   The last inconsistency in Buchanan's report involved the amount of time it took Sergeant Guilford to arrive at the crash scene.  According to his report, Sergeant Guilford testified that he came upon the crash scene and called it in to his dispatch, but the CAD report actually showed that there was "over a one minute delay from the time received until his arrival."   This inconsistency appears to be related to the fifth inconsistency listed in Buchanan's report, which also involved the amount of time it actually took Sergeant Guilford to arrive at the crash scene.]

The second inconsistency involved Sergeant Guilford's inability to see the occupants' faces, or to get the color, make, model or tag number for the Defendant's motorcycle even though he testified that at one point he was only 25 feet away.  However, McCarthy testified that she "extensively" cross-examined Sergeant Guilford on this inconsistency, and did not need the help of an accident reconstruction expert.  (ET 61).  The third inconsistency involved Sergeant Guilford first stating that the Defendant's motorcycle played "bumper cars" with the other motorcycles in order to pass them, but later stating that no contact was actually made.  However, McCarthy testified that she got Sergeant Guilford to clarify that the Defendant's motorcycle did not actually make contact with the other motorcycles but was rather just weaving through them.  (ET 61–62)  She did not need the help of an accident reconstruction expert.  (ET 62).

The fourth inconsistency involved Sergeant Guilford's identification of the victim as the passenger, with him initially stating that she was wearing a helmet and later testifying at trial that she was not.  However, McCarthy explained that at trial, she established that Sergeant Guilford during his deposition had stated that he could see the victim's hair sticking out of the back of her helmet, when in fact neither the Defendant nor the victim were wearing helmets.   McCarthy believed that the inconsistency was "a big deal" and so she "kept bringing it up."  (ET 62).  She brought it up in her opening and closing statements, and she also cross-examined Sergeant Guilford on it.  (ET

62).   She indicated that she was able to get Sergeant Guilford to acknowledge the inconsistency to the jury.  (ET 62).  She stated that she did not need an accident reconstruction expert to find the inconsistency regarding the helmets.  (ET 62–63).

The fifth inconsistency involved the time it took Sergeant Guilford to arrive at the crash scene.  According to Buchanan, at trial, Sergeant Guilford testified that he only lost sight of the motorcycle prior to the crash for 10 seconds, but at another point in his testimony he said one minute, and at his deposition he stated a few minutes.  She [McCarthy] "just kept laboring the point that he had changed his testimony, it couldn't be a few seconds and he finally admitted that it was longer." (ET 63).  She stated that she did not need an accident reconstruction expert to assist her in bringing out that inconsistency. (ET 63).  The sixth inconsistency involved Sergeant Guilford stating in his deposition that it was apparent that the Defendant was driving because the male was closer to the motorcycle at the accident scene, whereas at trial the only reason he gave that the female was the passenger was that she was wearing jeans.[FN 4]  With respect to this alleged inconsistency, the State asked McCarthy if she cross-examined Sergeant Guilford about "adding facts at trial that he previously had not testified to."  (ET 64).   McCarthy said, "Yes, especially about the clothing because he just came up with new testimony in the trial about what she was wearing." (ET 64).  McCarthy also got Sergeant Guilford to acknowledge that that was the first time that he had mentioned what the victim was wearing.  (ET 64).  Again, she indicated that she did not need an accident reconstruction expert.  (ET 64).

[FN 4:  In his report, Buchanan actually said it was during the deposition that Sergeant Guilford made reference to the female wearing jeans, but from the context of the relevant paragraph in the report it appears Buchanan actually meant that Sergeant Guilford's reference to the female wearing jeans was made during trial.  *See* State's Motion for Postconviction Discovery (with attached report).]

McCarthy's testimony at the evidentiary hearing then turned to Corporal Chapman's testimony.  She noted that Corporal Chapman was not able to give an expert opinion on who the driver was.  As a result, she did not believe that she needed to hire an independent accident reconstruction expert, explaining, "The burden was on the State to prove that Mr. Wood was the one driving, so since Corporal Chapman couldn't say one way or the other I didn't believe the state had enough proof." (ET 64).  She further explained that in her closing statement to the jury, her "theory of the events" was as follows:  "My theory was that Corporal Chapman couldn't say who was driving and he was the only one that had [an] expert opinion so . . . there was no one that could really say."  (ET 65). McCarthy also indicated that she pointed out to the jury that the State had promised scientific evidence but was unable to do so.  (ET 65).

On cross-examination, the Defendant got McCarthy to acknowledge that at trial, there was not an expert who was able to testify definitively as to who was the driver of the Defendant's motorcycle at the time of the crash.  (ET 66).  The Defendant also got her to acknowledge that had Buchanan testified at trial, he would have been able to give an expert opinion that the victim Arnett was the driver. (ET 66).

## Discussion

In the instant case, the Defendant claims that his trial counsel McCarthy was ineffective for failing to call an accident reconstruction expert as an expert witness.  In order for him to obtain postconviction relief from the Court on his claim, he must satisfy the two-prong test set forth in *Strickland v. Washington*, 104 S. Ct. 2052 (1984).  He first must identify particular acts or omissions by counsel that are outside the broad range of reasonable assistance under prevailing professional standards.  *Id.* at 2066.  Second, he must also demonstrate prejudice, a reasonable  probability that, but for trial counsel's error, the result in the case would have been different.  *Id.* at 2068.   A reasonable probability is one sufficient to undermine confidence in the outcome of the case.  *Id.*  With respect to the use of expert witnesses, under Florida

law, trial counsel is granted "great latitude in decisions regarding the use of expert witnesses." *Franqui v. State*, 965 So. 2d 22, 31 (Fla. 2007), *cert. denied*, 128 S. Ct. 2443 (2008). *See also Taylor v. State*, 120 So. 3d 540, 549 (Fla. 2013), *cert. denied*, 134 S. Ct. 1009 (2014) (quoting *Franqui*). The defendant has the burden of proving a claim of ineffective assistance of counsel at an evidentiary hearing on a Rule 3.850 motion. *Pennington v. State*, 34 So. 3d 151, 154 (Fla. 1st DCA 2010).

Most of Buchanan's report, and ensuing testimony at the evidentiary hearing, focused on inconsistencies that Buchanan had found in Sergeant Guilford's testimony at trial, from when Sergeant Guilford first spotted the Defendant's motorcycle to when he arrived at the crash scene. This is understandable since Sergeant Guilford was the State's key witness at trial, insofar as he was the only witness who was able to testify to seeing the victim Arnett on the back of the Defendant's motorcycle as a passenger just before the crash. However, at trial, Sergeant Guilford testified as a lay witness, not as an expert, and certainly none of the inconsistencies that Buchanan pointed out involved specialized knowledge that would require the opinion of an expert. Rather, the inconsistencies merely involved the details of Sergeant Guilford's observations as an eyewitness, and included such matters as Sergeant Guilford initially being able to see how many persons were on the motorcycles or which lanes they were in, even though he was 150 yards away and they were traveling about 100 miles per hour; Sergeant Guilford's inability to get the color, make, model or tag number for the Defendant's motorcycle even though he testified that at one point he was only 25 feet away; whether the Defendant's motorcycle was playing "bumper cars" with the other motorcycles in order to pass them; whether or not the victim was wearing a helmet; the amount of time it actually took Sergeant Guilford to arrive at the crash scene; and whether Sergeant Guilford otherwise added facts to his trial testimony that he had previously not testified to. Notably, as indicated, at the evidentiary hearing, McCarthy testified that she did in fact cross-examine Sergeant Guilford on the inconsistencies listed in Buchanan's report, and that she did not need the assistance of an accident reconstruction expert to that end. The trial transcript confirms that at

trial McCarthy questioned Sergeant Guilford at length about the inconsistencies during cross-examination, and that McCarthy also pointed out the inconsistencies to the jury during her opening and closing statement. (TT 27–28, 66–92, 300–302).[FN 5]

> [FN 5: Citations to the trial transcript will appear as "TT," followed by the appropriate page number, *e.g.*, (TT 3).]

Accordingly, the Court finds that the Defendant's trial counsel McCarthy did not render a deficient performance under the first prong of *Strickland* for not seeking the assistance of an accident reconstruction expert in order to point out inconsistencies in the trial testimony of Sergeant Guilford. As noted, the inconsistencies pointed out by Buchanan all involved matters that clearly would be well within the province of a competent criminal defense lawyer, so her determination that she did not need an accident reconstruction expert to find inconsistencies in Sergeant Guilford's testimony was a reasonable strategic decision, *see Chavez v. State*, 12 So. 3d 199, 208 (Fla.), *cert. denied*, 130 S. Ct. 501 (2009) ("Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."), and well within the "great latitude" that counsel is afforded in "decisions regarding the use of expert witnesses." *See Franqui*, 965 So. 2d at 31. *See also Taylor*, 120 So. 3d at 549 (quoting *Franqui*). Because there is no deficient performance under the first prong of *Strickland*, it is not necessary for the Court to address the second prong. *See Strickland*, 104 S. Ct. at 2069. However, in passing, the Court would note that since McCarthy ably brought out the inconsistencies during her crossexamination [sic] of Sergeant Guilford, and in her opening and closing statement, there is no possible prejudice under the second prong of *Strickland*. Thus, the Court concludes that the Defendant's trial counsel McCarthy did not render ineffective assistance of trial counsel in this respect and that the Defendant has failed to carry his burden. *See Pennington*, 34 So. 3d at 154.

To be sure, Buchanan's report and testimony at the evidentiary hearing did not merely involve inconsistencies that Buchanan had found in Sergeant Guilford's eyewitness testimony at trial, as his report and testimony also concerned Corporal Chapman's investigation, and, notably, concluded with his expert opinion that the victim Arnett was the driver of the motorcycle at the time of the crash. In this connection, the Defendant in his Post-Evidentiary Hearing Memorandum points out that while Corporal Chapman was not able to give an expert opinion that the Defendant was the driver at the time of the crash, Corporal Chapman otherwise still indicated to the jury that the Defendant was the driver.[FN 6]  The Defendant thus urges that Buchanan's expert opinion that the victim Arnett was the driver would have "completely refuted Corporal Chapman's testimony."  Moreover, he points out that he would have had the benefit of expert testimony specifically opining that the victim was the driver, rather than merely being left to argue that Corporal Chapman was unable to give an expert opinion on the issue.

> [FN 6:  At trial Corporal Chapman stated that he could only make a "reasonable assumption" about who was driving the motorcycle at the time of the accident. (TT 157).]

At the evidentiary hearing, McCarthy explained why she decided that she did not need opinion testimony from an accident reconstruction expert at trial.  She testified that her theory of the case during trial was that the State did not have enough proof against the Defendant.  As she explained, "The burden was on the state to prove that Mr. Wood was the one driving, so since Corporal Chapman couldn't say one way or the other I didn't believe the State had enough proof." (ET 64).  Since Corporal Chapman could not give an expert opinion on who the driver was, she decided that she did not need to hire an accident reconstruction expert. (ET 64 ).

The Court as the finder of fact finds that McCarthy's testimony at the evidentiary hearing was credible, and further finds that her theory of the case—that the State did not have enough proof against the Defendant—was eminently reasonable in light of the instant facts and

circumstances.  As McCarthy correctly pointed out, the burden of proof was solely on the State at trial.  Furthermore, it is clear that the State's case against the Defendant was somewhat weak in terms of physical evidence.  At the evidentiary hearing, Buchanan himself noted that among other things, "trace evidence" of any jeans fibers on the motorcycle tank should have been collected during the crash investigation to determine who the driver was.  (ET 25).  Similarly, at trial, Corporal Chapman stated that he could not give an expert opinion on who the driver was, explaining that there was no DNA, in contrast to an automobile accident in which it is often possible to get DNA from the vehicle.  (TT 157).  Thus, McCarthy testified that she was able to point out to the jury that the State had promised scientific evidence but was unable to do so.  (ET 65).  The record confirms that she did this during her closing statement to the jury:

> Did they present any scientific evidence to show you what happened?  No.  They asked, Corporal Chapman testified to you that he could not say scientifically who was riding that bike.  He didn't know, he couldn't say.  He's an accident reconstruction expert and he can't tell you who was driving, so there's no scientific evidence.  He made some suppositions, he said through experience went this way or that way, but he could not give you scientific evidence that she died because Mr. Wood was driving and he couldn't even give you scientific evidence that Mr. Wood was the one driving, so the State did not give you any scientific evidence.  There's nothing there.

(TT 299–300).  Further, due to the relative paucity of physical evidence, and lack of expert testimony from the State, the State's case hinged in large part upon the credibility of Sergeant Gilford's [sic] eyewitness testimony, but as discussed, McCarthy was also able to point out to the jury numerous inconsistences in his testimony.[FN 7]  In short, her theory of the case was wholly reasonable.

[FN 7: As discussed, she was able to do this without needing the assistance of an accident reconstruction expert.]

Since McCarthy's theory of the case was reasonable, it follows that her strategic decision not to use opinion testimony from an accident reconstruction expert at trial was also reasonable, since such opinion testimony would not have been needed to support her theory that the State did not have enough proof against the Defendant. *See Chavez*, 12 So. 3d at 208 ("Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."). The Court also finds that her decision not to use expert testimony in these circumstances was within the "great latitude" that counsel is afforded in "decisions regarding the use of expert witnesses." *Franqui*, 965 So. 2d at 31. *See also Taylor*, 120 So. 3d at 549 (quoting *Franqui*).

In this connection, the Court finds instructive the recent decision of the Fourth District Court of Appeal in *Smith v. State*, 154 So. 3d 1191 (Fla. 4th DCA 2015),[FN 8] which involved facts and circumstances analogous to those in the instant case. In *Smith*, the defendant was convicted of three counts of vehicular homicide. At trial, the prosecution presented evidence that he ran a red light and struck a vehicle that was making a left turn across his lane. The defendant in *Smith* then filed a Rule 3.850 motion claiming that his trial counsel was ineffective for failure to call an accident reconstruction expert to rebut the prosecution's experts at trial. At the evidentiary hearing, his trial counsel testified that after evaluating all options while preparing for trial, he decided not to hire an accident reconstruction expert, reasoning that an expert would not necessarily assist the defense and might even bolster the prosecution's case. The defendant admitted that he was speeding through the intersection, and while he claimed the traffic light was yellow, the prosecution presented eyewitness testimony that the light was red when he entered the intersection. Trial counsel opined that no expert on either side would be able to testify on exactly what color the light was at the time of actual impact. The trial court found

trial counsel's testimony to be credible, and further found that his decision not to call an accident reconstruction expert at trial was the product of reasonable assistance for purposes of *Strickland*, and was made after careful review of alternative options that existed at that time. The Fourth District affirmed, agreeing with the trial court's finding that trial counsel's performance was not deficient under the first prong of *Strickland*.

> [FN 8: *Smith* was not cited by the parties but was disclosed by the Court's independent research.]

Just as the defendant in *Smith* claimed that the traffic light was yellow to the contrary of the eyewitness testimony, the Defendant in the instant case similarly claimed that the victim was driving the motorcycle to the contrary of the eyewitness testimony. Also similar to *Smith*, the Defendant's trial counsel McCarthy decided not to hire an accident reconstruction expert, determining that an expert would not help. Just as trial counsel in *Smith* opined that no expert on either side would have been able to testify on exactly what color the traffic light was at the time of actual impact, McCarthy noted that "Corporal Chapman couldn't say who was driving and he was the only one that had [an] expert opinion so . . . there was no one that could really say." Notably, in *Smith*, trial counsel was deemed not to be ineffective for failure to hire an accident reconstruction expert under circumstances similar to those in the instant case, even though it appears from the *Smith* opinion that the prosecution had experts testifying at trial. *See Smith*, 154 So. 3d at 1193. In contrast, in the instant case, Corporal Chapman was not able to give an expert opinion, but was only able to make a "reasonable assumption" about who was driving the motorcycle at the time of the accident. It follows that if trial counsel in *Smith* was not ineffective for failure to call an accident reconstruction expert when the prosecution had experts testifying at trial, then McCarthy in the instant case should not be ineffective for failure to call an accident reconstruction expert when there was no expert testimony at all, just a "reasonable assumption" from a State witness who otherwise declined to give an expert opinion. In short, the facts and circumstances in *Smith* are similar to the instant case, and *Smith* accordingly supports a

determination that trial counsel in the instant case made a reasonable decision not to present the expert testimony of an accident reconstruction expert at trial.

To be sure, the Defendant's trial counsel McCarthy was ultimately not successful with her theory of the case and strategic decision not to present the expert testimony of an accident reconstruction expert at trial. However, that does not mean that her performance in this respect was somehow deficient. As *Strickland* explained,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 104 S. Ct. at 2065 (citation omitted). In evaluating McCarthy's performance "from counsel's perspective at the time" and with the high level of deference required under *Strickland*, the Court finds that McCarthy did not render a deficient performance under the first prong of *Strickland* for not presenting at trial expert opinion testimony from an accident reconstruction expert that the victim Arnett was the driver.

Because there is no deficient performance under the first prong of *Strickland*, it is not necessary for the Court to address prejudice under the second prong, *see Strickland*, 104 S. Ct. at 2069, though in any event the Court would find that there is no prejudice. As the State points out in its Post-Evidentiary Hearing Memorandum, had Buchanan

given his expert opinion at trial that the victim Arnett was the driver of the motorcycle, the State then would have been able to challenge his opinion as it did during the evidentiary hearing. As noted, part of Buchanan's opinion was based on what he called the Defendant's "departure angle," which was determined by where he hit the sidewalk and his final rest position. In turn, the final rest position was based on Buchanan's opinion that the Defendant would not have been not able to move after the crash in light of the injuries he had sustained.[FN 9] (ET 51). However, on cross-examination, the State got Buchanan to concede that he is not a doctor who would be qualified give a medical opinion on whether the Defendant could have moved after the crash. (ET 53, 54). Additionally, the State would have been able to argue that Buchanan's expert opinion was inconsistent with the physical evidence. It is undisputed that the victim Arnett hit a street sign, which essentially cut her up the middle and caused her fatal injuries. As the State points out, if Buchanan was correct in opining that she was driving the motorcycle and was not ejected before hitting the sign (as noted, he claimed that she was sliding along the ground with the motorcycle down when she hit the sign), there is no explanation for how she could have received her injuries, given the height of the sign and the fact the motorcycle would have protected the area where she was injured if she had stayed with the motorcycle. Finally, the State would have been able to argue that the physical evidence also supported the determination that the Defendant was the driver. The State notes that the motorcycle's left handle bar was broken and the Defendant's left wrist was broken, which would be consistent with the handle bar coming down and his wrist getting broken with him as the driver. (ET 54–55).

> [FN 9: In a footnote, the State further calls into question Buchanan's determination of the Defendant's final rest position, pointing out that his statement "Because that's where they found him" is at odds with the trial transcript and traffic homicide report. *See* State's Post-Evidentiary Hearing Memorandum at n.4.]

> In short, the Court finds that the Defendant has failed to prove either a deficient performance or resulting prejudice for purposes of *Strickland* with respect to his trial counsel McCarthy not having an accident reconstruction expert testify that the victim Arnett was the driver of the Defendant's motorcycle at the time of the crash. Accordingly, the Court concludes that McCarthy did not render ineffective assistance of trial counsel in this respect and that the Defendant has failed to carry his burden. *See Pennington*, 34 So. 3d at 154.

(Ex. P at 924–33). The First DCA affirmed the circuit court's decision without written opinion (Ex. AA).

With respect to the state court's factual determinations, Petitioner has not identified clear and convincing evidence in the state court record which demonstrates that any factual determination, including the factual determination that trial counsel made a strategic decision not to present expert testimony of an accident reconstruction expert at trial, was unreasonable. Therefore, Petitioner has not satisfied § 2254(d)(2).

With respect to § 2254(d)(1), it is evident that the state court engaged in a straightforward application of the correct rule of law, i.e., the *Strickland* standard, in analyzing Petitioner's ineffective assistance of trial counsel ("IATC") claim. Petitioner has not demonstrated that the state court mischaracterized or deviated from that standard; nor has Petitioner demonstrated that the state court's result contradicted the result of a Supreme Court case on the same record. Therefore,

Petitioner has not shown that the state court's adjudication was "contrary to" Supreme Court precedent, for purposes of § 2254(d)(1).

Petitioner must therefore satisfy the "unreasonable application" prong in order to satisfy § 2254(d)(1).  In order to satisfy this prong, Petitioner is required to demonstrate that the state court decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, — U.S. —, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014) (internal quotation marks omitted).

A fairminded jurist could agree with Petitioner's theory, that if trial counsel had presented testimony from John Buchanan, it would have been the only expert testimony presented at trial, and it would have supported the defense theory that Petitioner was not driving the motorcycle at the time of the accident.  But it also would not be objectively unreasonable for a fairminded judge to conclude— especially in light of the deference afforded trial counsel under *Strickland*—that the failure to present expert testimony was not due to incompetence, but instead due to counsel's reasonable belief that the State did not have sufficient evidence to prove beyond a reasonable doubt that Petitioner was the driver, and counsel's reasonable desire to keep the jury focused on the burden of proof and the party who was required to meet it.  Furthermore, if defense counsel had retained an accident reconstruction

expert, she would have risked the State's responding by obtaining an opinion from a truly qualified accident reconstruction expert, instead of simply relying on Corporal Chapman's testimony (which, as the state court found, did not constitute expert testimony). Defense counsel eliminated that risk by focusing the jury on the inconsistencies and weaknesses of Sergeant Guilford's description of his observations of the motorcycle just prior to the accident, and Corporal Chapman's inability to give an expert opinion about who was driving the motorcycle, and instead making only a "reasonable assumption" on this issue. Applying the deference due the state court's decision under the AEDPA, and trial counsel's performance under *Strickland*, a fairminded jurist could certainly conclude that the state court was not objectively unreasonable in deciding that trial counsel was not incompetent under *Strickland.*

Petitioner failed to carry his burden under § 2254(d). Therefore, he is not entitled to federal habeas relief on Ground One.

B.    Ground Two: "Defense counsel rendered ineffective assistance of counsel by failing to retain a toxicologist."

Petitioner alleges he testified at trial that he was not intoxicated on the night of the motorcycle accident (ECF No. 1 at 8–9). He contends defense counsel was ineffective for failing to present testimony from a toxicologist to support Petitioner's

testimony and to rebut the testimony of the State's toxicology expert, whose testimony was based upon testing of a sample of Petitioner's blood obtained hours after the accident (*id.*). Petitioner alleges he proffered evidence in the Rule 3.850 proceeding, that he retained a toxicologist who reviewed the case and concluded that Petitioner' blood alcohol level was below .08 grams of alcohol per milliliters of blood at the time of the accident (*id.*). Petitioner alleges defense counsel's decision not to retain a toxicologist was unreasonable, and the result of trial would have been different if trial counsel had presented testimony from an expert (*id.*).

Respondent asserts, without conceding or waiving an exhaustion defense, that it "appears" Petitioner exhausted this claim by presenting it as Ground 2 of his third amended Rule 3.850 motion (ECF No. 23 at 36 n.6). Respondent contends the state court adjudicated the merits of the claim (*id.* at 31–36). Respondent contends Petitioner has not shown that the state court's denial of the claim was contrary to or an unreasonable application of clearly established federal law, or that it rested upon an unreasonable determination of the facts in light of the evidence presented (*id.* at 36–38).

      1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

      2.    Federal Review of State Court Decision

Petitioner presented this claim as one of the arguments in Ground 2 of his third amended Rule 3.850 motion (Ex. N at 701–02). In the state circuit court's written decision denying Ground 2, the court correctly stated the deficient performance and prejudice prongs of the *Strickland* standard as the applicable legal standard (Ex. N at 721–22). The court adjudicated Ground 2 as follows:

> The Defendant argues that his trial counsel was ineffective for failure to retain a toxicologist, and to present the toxicologist as a defense witness at trial. He repeats his argument that he was not driving the motorcycle at the time of the accident, but nonetheless urges that regardless of who was driving, he was not intoxicated at the time of the accident, and therefore could not have been guilty of DUI manslaughter. Thus, he complains that trial counsel failed to present a toxicologist to establish that he was not legally intoxicated at the time of the accident. He states that he has recently retained toxicologist Lawrence Masten, who has reviewed the instant case and has concluded that his blood alcohol level was below .08 grams of alcohol per 100 milliliters of blood. The Defendant urges that trial counsel's failure in this respect was deficient and resulted in prejudice.
>
> . . . .
>
> [W]ith respect to trial counsel's alleged ineffectiveness for failure to use a toxicologist, the Court finds that the Defendant is not entitled to relief. As indicated, the Defendant's defense at trial was that he was not driving the motorcycle at the time of the accident; rather, he claimed that the victim was the driver, and that he was merely on the back as a passenger. (T 25–29, 299–304). In arguing this defense, trial counsel claimed that he [Defendant] was the only person who knew what happened. (T 29, 303). Trial counsel also argued:
>
>> The State also finds it's very, very significant that [the Defendant] would let a woman ride his bike because somehow this is just unbelievable. As Mr. Register [the prosecutor] puts it, why would you ride behind a woman?

> Well, why not?  He met this woman at a bar, they were
> both drinking, she was really attractive, he really liked her,
> why wouldn't he want to please her, why wouldn't he want
> to do what she asked him to do, let her ride the bike, get to
> know her[ ].  Maybe the[y] could get closer.  It happens all
> the time.

(T 303).  The Defendant himself testified that he let the victim drive his
motorcycle, and the next thing he remembered was waking up in an
ambulance.  (T 228–230).  The Court determines that a toxicologist's
opinion that the Defendant's blood alcohol was below .08 would not
have helped support his defense that he was not driving the motorcycle
at the time of the accident.  As the State aptly notes in its response, if
in fact he was not driving the motorcycle as he claimed, it would have
been perfectly legal for him to have had a blood alcohol level above
.08.  The Court also determines that trial counsel otherwise did not
perform deficiently for not using a toxicologist, since he was able to
use the defense that he was not driving the motorcycle at the time of the
accident, which, under the instant factual circumstances, was arguably
a stronger defense than lack of intoxication.[FN 3]  *See State v.
Hanania*, 715 So. 2d 984 (Fla. 2d DCA), *review denied*, 727 So. 2d 905
(Fla. 1998) (accepting as tactical decision trial counsel's failure to raise
entrapment defense in light of damaging facts and separate defense that
was available; neither prong of *Strickland* satisfied).  *Compare Platt v.
State*, 697 So. 2d 989 (Fla. 4th DCA), *cause dismissed*, 699 So. 2d 1375
(Fla. 1997) (reversing summary denial of postconviction relief; failure
to request jury instruction constituted an unreasonable omission by
counsel and prejudiced defendant when the error negated the only
defense).  In short, under the circumstances, trial counsel's performance
was not deficient for purposes of *Strickland* for failing to use a
toxicologist.

> [FN 3:  As will be discussed, there was strong evidence
> that he was intoxicated at the time of the accident.]

Additionally, even if trial counsel had presented a toxicologist to
testify that the Defendant's blood alcohol was below .08, the Court

finds there is no reasonable probability that this testimony would have affected the outcome of the trial under *Strickland*. To be sure, in *Goldman v. State*, 57 So. 3d 274 (Fla. 4th DCA 2011), the Fourth District held that trial counsel could be ineffective for failure to retain a toxicologist in a DUI manslaughter case. However, the Court finds that *Goldman* is distinguishable.

In *Goldman*, the defendant's blood alcohol level tested out to .20, nearly three times the legal limit. However, *Goldman* characterized the blood test results as "seemingly anomalous," noting that there "were sufficient reasons apparent from the record to question" them. *Goldman*, 57 So. 3d 277, 278. Notably, the officer testified that the defendant did not appear to be intoxicated, and her handwriting at the scene of the accident was "inconsistent with a person having a blood alcohol level nearly three times the legal limit." *Id.* at 277. The defendant herself claimed that she had drunk no more than three beers several hours before the accident, and the State's own expert testified that a person the defendant's size would have had to drink six and a half beers to have a .20 blood alcohol level. Though the defendant was detained for five hours, she made no request to use a restroom. Additionally, there were indications that her blood sample might have been mishandled and thereby yielded inaccurate test results. The defendant otherwise did not have a good defense. Under the circumstances, *Goldman* determined that the defendant showed a reasonable probability the outcome would have been different if the jury had received expert testimony about how mishandling could increase the amount of alcohol in the blood sample, and held that her claim was sufficient to warrant an evidentiary hearing.

In contrast to the factual circumstances present in *Goldman*, in the instant case there is simply nothing in the trial testimony to indicate that the Defendant's blood sample might have been mishandled or that blood alcohol test results might have been otherwise inaccurate. At trial, Florida Highway Patrol Trooper Wesley Harsey testified to taking the blood draw kit to the hospital, watching emergency room nurse Frank Thewatt [sic] draw the Defendant's blood, transporting the blood, and then logging it into evidence. (T 165–172). Thewatt [sic]

testified to drawing the Defendant's blood at Harsey's request. (T 172–177). FDLE agent Dale Livingston testified to maintaining the chain of custody and to calibrating the gas chromatograph. (T 188–90). Livingston then testified that he performed two tests on the Defendant's blood sample and the results were "essentially the same" each time: .187 and .183. (T 190).

Further, in *Goldman*, the officer gave eyewitness testimony that the defendant did not appear intoxicated, which tended to call into question the blood alcohol test results. However, in contrast to *Goldman*, in the instant case four eyewitnesses gave strong, consistent testimony that the Defendant appeared to be intoxicated at the time of the accident, which served to corroborate the blood alcohol test results and which otherwise constituted independent evidence of intoxication. Emergency medical technician Kevin Melvin testified that he smelled alcohol on the Defendant while working on him and that the odor was "pretty strong." (T 130). Moreover, the Defendant was "'very belligerent" and "cussed" at him the "whole time," and "didn't want to cooperate." (T 130). Emergency medical technician Charles Jeter similarly testified that the Defendant was "quite uncooperative and pretty belligerent," and wanted to get out of the ambulance. (T 134, 135). Additionally, he could smell a "very strong" odor of alcohol on the Defendant. (T 135). Trooper Harsey testified that when standing directly over the Defendant's hospital bed, he detected the "strong odor of an alcoholic beverage." (T 167). Nurse Thweatt testified that there was a "heavy smell of alcohol" coming from the Defendant. (T 174). Notably, the Defendant himself admitted that he had had three or four drinks before even leaving the gentleman's club. (T 238). In short, *Goldman* is distinguishable from the instant case, and there is no reasonable probability that testimony from a toxicologist on the Defendant's behalf would have affected the outcome of the trial under *Strickland*.

(Ex. N at 723–26). The First DCA affirmed the decision without written opinion

(Ex. W).

The state court's factual findings, with regard to the evidence adduced at trial, are supported by the trial transcript. Kevin Melvin testified he was working for Bay Medical Emergency Medical Services ("EMS") and responded to the motorcycle crash involving Petitioner and Ms. Arnett at approximately 1:00 a.m. on September 28, 2008 (Ex. E at 128–29). Mr. Melvin testified Petitioner was lying on the ground when he arrived (*id.* at 130). Melvin testified that firemen, who were already on the scene, assisted him in placing Petitioner on a spine board and then onto a gurney and into the ambulance (*id.* at 130–31). Mr. Melvin testified:

> We put a collar on him, a C-collar around his neck for his spine. Also we took him and tried to put him on the board and the whole time I was trying to get him to be still, calm down, talk to me, tell me where he was hurting at, just asking him all sorts of questions, um, he was very belligerent, cussed at me the whole time, didn't want to cooperate, wanted me to leave him alone so he could get up and go, I don't know where he was thought he was going to go, but he was wanting to get up and leave. I don't know exactly what was going on.

(Ex. E at 130). Melvin testified he smelled alcohol on Petitioner, and "[i]t was pretty strong because I was real close to him" (*id.*). Melvin continued:

> . . . when we got him in the back of the truck my paramedic come [sic] and got in there and we started working on him more and he was very belligerent, never said anything that come [sic] out of his mouth hardly was not a cuss word. He told us, you know, leave him alone, let him get up and let him get out of the back of the truck. He was uncooperative, he cussed us for everything we were worth and all we were trying to do is help him.

(Ex. E at 131). Mr. Melvin testified that approximately 10–12 minutes elapsed between the time they left the scene in the ambulance to the time they arrived at the hospital (*id.*).

Charles Jeter testified he responded to the scene with Kevin Melvin (Ex. E at 132). Jeter testified he observed Melvin and the firemen moving Petitioner from the spine board to the gurney (*id.*). Mr. Jeter testified Petitioner was "quite uncooperative and pretty belligerent" (*id.*). Jeter testified Petitioner cursed at him and wanted to leave the ambulance (*id.* at 135). Mr. Jeter testified he smelled a "very strong" odor of alcohol on Petitioner (*id.*).

Wes Harsey, a trooper with the Florida Highway Patrol ("FHP"), testified he responded to the scene of the accident at approximately 1:45 a.m. (Ex. F at 165–66). Trooper Harsey testified he spoke with Trooper Chapman and then went to the Gulf Coast Medical Center to obtain a blood sample from Petitioner (*id.* at 166). Trooper Harsey testified that when he arrived at the hospital, Petitioner was lying in a hospital bed. Harsey testified that as he stood over Petitioner's bed, he smelled "the strong odor of an alcoholic beverage" (*id.* at 167). Trooper Harsey testified asked Nurse Frank Thweatt to use the Tritonics Blood Kit, which is used by the Highway Patrol to collect and store blood samples, to collect a blood sample from Petitioner (*id.* at 167–69). Harsey testified he observed Nurse Thweatt swab Petitioner's arm with a

Betadine swab from the blood kit and collect two vials of blood (*id.* at 170).  Harsey testified he also observed Nurse Thweatt invert the vials back and forth to mix an anticoagulant with it, to prevent the blood from coagulating (*id.* at 170–71).  Trooper Harsey testified that the vials of blood were sealed, and Nurse Thweatt initialed the vials and marked them with the date and time, "9-28-08—2:55 a.m." (*id.* at 171).  Harsey testified he placed Petitioner's name on the vials, and Harsey initialed them and wrote his identification number on them (*id.*).  Trooper Harsey testified he placed the vials into a plastic bag, sealed the bag, placed the bag in a box, and sealed the box (*id.*).  Trooper Harsey testified he took the box to the FHP station, logged it into the evidence computer system at 4:55 a.m., and deposited it in the evidence safe (*id.* at 172).

Mark Thweatt testified he works as a registered nurse at the Gulf Coast Medical Center (Ex. F at 172–73).  Nurse Thweatt testified he took a blood draw from Petitioner at the request of an FHP trooper (*id.* at 174–75).  Nurse Thweatt testified he used a nonalcoholic swab to clean the area and then took two vials of blood from Petitioner (*id.* at 175–76).  Thweatt testified he sealed and initialed the vials and then gave them to the trooper (*id.* at 176).  Nurse Thweatt also testified he smelled a "heavy smell of alcohol" coming from Petitioner (*id.* at 174).

Robert Ifft testified he is a lieutenant with the FHP (Ex. F at 178). Lieutenant Ifft testified he removed the evidence box containing the blood samples from the evidence safe at 6:00 p.m. on September 28, 2008 (*id.* at 181). Ifft testified he mailed the box to the FDLE on September 29, 2008 at 12:50 p.m. (*id.*).

Dale Livingston testified he is a trained toxicologist with the FDLE (Ex. F at 182–83). Mr. Livingston testified the FDLE received Petitioner's blood samples on October 1, 2008, assigned a laboratory case number, and the samples were placed in a refrigerator (*id.* at 186–87). Mr. Livingston testified he performed a blood alcohol test on the samples on October 8, 2008, and prepared a report on October 9, 2008 (*id.* at 187–90). Livingston testified that the tests indicated .187 and .183 percent ethyl alcohol (*id.* at 190).

Petitioner admits that defense counsel knew, from pre-trial depositions, that the State would present this evidence (i.e., the observations of medical and law enforcement personnel, the chain of custody of the blood samples, and the testing of the blood samples) at trial (*see* ECF No. 31 at 16). Petitioner did not allege in his Rule 3.850 motion that defense counsel was aware of any circumstances that indicated a reason the FDLE's blood test results were not accurate and reliable indicators of Petitioner's blood-alcohol level at the time of the accident. The absence of such an indication, and the existence of the evidence described *supra*, provided a

reasonable basis for a defense attorney to forgo presenting a toxicologist's opinion regarding whether Petitioner's blood-alcohol level was .08 or more at the time of the accident. Furthermore, the State had strong evidence that Petitioner was intoxicated at the time of the accident; whereas, the State's evidence that Petitioner was driving the motorcycle was substantially weaker. It was reasonable for defense counsel to focus the defense on impeaching the State's evidence on the issue of who was driving, instead of turning the jury's attention to the issue of whether Petitioner's blood-alcohol level was less than .08. The state court reasonably concluded that defense counsel was not deficient for failing to retain a toxicology expert.

Additionally, even if a toxicologist would have testified that Petitioner's blood-alcohol level was below .08 at the time of the accident, Petitioner still could have been found guilty of DUI manslaughter. To prove the "under the influence" element of DUI, the State was required to prove that while driving the vehicle, Petitioner either (1) had a blood-alcohol level of .08 or more, or (2) was under the influence of alcoholic beverages to the extent that his normal faculties were impaired, or both (*see* Ex. G At 272–73). *See* Fla. Standard Jury Instructions in Criminal Cases 7.8. The term "normal faculties" includes the ability to see, hear, walk, talk, judge distances, drive an automobile, make judgments, act in emergencies and, in general, to normally perform the many mental and physical acts of daily life

(*see* Ex. G at 273).   *See* Fla. Standard Jury Instructions in Criminal Cases 7.8.

Additionally, Florida law at the time of Petitioner's offense provided, in

relevant part:

> (2) At the trial of any civil or criminal action or proceeding arising out
> of acts alleged to have been committed by any person while driving, or
> in actual physical control of, a vehicle while under the influence of
> alcoholic beverages or controlled substances, when affected to the
> extent that the person's normal faculties were impaired or to the extent
> that he or she was deprived of full possession of his or her normal
> faculties, the results of any test administered in accordance with s.
> 316.1932 or s. 316.1933 and this section are admissible into evidence
> when otherwise admissible, and the amount of alcohol in the person's
> blood or breath at the time alleged, as shown by chemical analysis of
> the person's blood, or by chemical or physical test of the person's
> breath, gives rise to the following presumptions:
>
> (a) If there was at that time a blood-alcohol level or breath-alcohol level
> of 0.05 or less, it is presumed that the person was not under the
> influence of alcoholic beverages to the extent that his or her normal
> faculties were impaired.
>
> (b) If there was at that time a blood-alcohol level or breath-alcohol level
> in excess of 0.05 but less than 0.08, that fact does not give rise to any
> presumption that the person was or was not under the influence of
> alcoholic beverages to the extent that his or her normal faculties were
> impaired but may be considered with other competent evidence in
> determining whether the person was under the influence of alcoholic
> beverages to the extent that his or her normal faculties were impaired.
>
> (c) If there was at that time a blood-alcohol level or breath-alcohol level
> of 0.08 or higher, that fact is prima facie evidence that the person was
> under the influence of alcoholic beverages to the extent that his or her
> normal faculties were impaired.  Moreover, such person who has a
> blood-alcohol level or breath-alcohol level of 0.08 or higher is guilty of

driving, or being in actual physical control of, a motor vehicle, with an unlawful blood-alcohol level or breath-alcohol level.

Fla. Stat. § 316.1934(2).

In state court, Petitioner did not allege that Dr. Masten would have testified that Petitioner's blood-alcohol level was 0.05 or less at the time of the accident; instead, Petitioner alleged only that Dr. Masten would have testified that Petitioner's blood-alcohol level was less than 0.08. In such a case, the jury would have been required to consider the test results with other competent evidence, in determining whether Petitioner was under the influence to the extent his normal faculties were impaired. Considering the EMS personnel's description of Petitioner's behavior as belligerent, uncooperative, and angry, while they were simply attempting to provide him with emergency medical treatment for his fractured right leg, two broken hips, broken pelvis, crushed left hand, and severed left thumb (*see* Ex. F at 231), as well as the evidence that Petitioner emitted a strong odor of alcohol, and he admitted he drank 3 or 4 drinks prior to getting on the motorcycle, there was little chance a jury would find that Petitioner's normal faculties were not impaired.

Petitioner has not shown that the state court's rejection of his IATC claim was so unjustified that it "was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103;

*accord Bobby v. Dixon*, 565 U.S. 23, 132 S. Ct. 26, 181 L. Ed. 2d 328 (2011) (per curiam); *see also Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1258 (11th Cir. 2012). Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

> C.    Ground Three: "Defense counsel rendered ineffective assistance of counsel by failing to retain an independent motorcycle expert."

Petitioner alleges the State presented testimony from a "skilled witness," that it would have been difficult for someone of Ms. Arnett's weight and stature to ride Petitioner's motorcycle, let alone start it and move it forward (ECF No. 1 at 10–11). Petitioner alleges John Buchanan, the accident reconstruction expert he retained to testify in the Rule 3.850 proceeding, opined that Ms. Arnett could have operated the motorcycle with a man of Petitioner's size riding as a passenger (*id.* at 11). Petitioner alleges Mr. Buchanan also opined that many women, even those of smaller stature than Ms. Arnett, owned the type of motorcycle Petitioner owned (*id.*). Petitioner alleges Mr. Buchanan also determined, from viewing a photograph of the motorcycle's tachometer, that the motorcycle was in first gear when it crashed, and he opined, "It tells me that it's consistent that she was the driver because she would not know how to shift. She was going to be in first gear." (*id.*). Petitioner contends

the result of his trial would have been different if defense counsel had presented testimony from a "motorcycle expert" (*id.*).

Respondent asserts, without conceding or waiving an exhaustion defense, that it "appears" Petitioner exhausted this claim by presenting it as Ground 3 of his third amended Rule 3.850 motion (ECF No. 23 at 41 n.7). Respondent contends the state court adjudicated the merits of the claim (*id.* at 41). Respondent contends Petitioner has not shown that the state court's denial of the claim was contrary to or an unreasonable application of clearly established federal law, or that it rested upon an unreasonable determination of the facts in light of the evidence presented (*id.* at 42–43).

### 1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 3 in his Rule 3.850 motion (Ex. N at 702–04). The state circuit court adjudicated the claim as follows:

> The Defendant asserts that his trial counsel was ineffective for failure to retain an expert witness or skilled witness to testify that a woman of the height and weight of the victim would have been able to drive his motorcycle. As indicated, the State's theory at trial was that the Defendant was driving the motorcycle when the accident occurred. According to the Defendant, the State presented testimony of a witness who indicated that it would have been difficult for someone who was

the size of the victim to drive the motorcycle, or even get the motorcycle started and moving forward.  Also according to the Defendant, the witness additionally indicated that the Defendant could not have assisted her in stabilizing the motorcycle because he would not have been able to do so from its back.

The Defendant argues that because his defense was that the victim, not he, was driving the motorcycle at the time of the accident, it was imperative to show that a person of her weight and stature was physically capable of doing so.  Thus, he complains that trial counsel failed to present compelling evidence to support his defense, and that trial counsel's failure was deficient and resulted in prejudice wider *Strickland*.  For support, he states that his accident reconstruction expert Buchanan has also opined that the victim could have driven the motorcycle, and also could have done so with a man the size of the Defendant riding as a passenger.  Buchanan has also opined that "many women," even those of "smaller stature" than the victim, choose the type of motorcycle owned by the Defendant.

The State witness referenced by the Defendant was Justin Green, the manager of Yamaha Seadoo.[FN 4]  At trial, Green did not testify as an expert, nor did he testify that the victim or a person her size could not have been driving the motorcycle. ( T 107–113).  Rather, on direct, Green testified that if a person's feet could not touch the ground, that person would still be able to get the motorcycle going, though it "would just be harder to do because it would be hard to hold the motorcycle up."  (T 111–12).  On cross-examination, when trial counsel asked Green whether he ever sold motorcycles to women at his dealership, he answered, "All the time."  (T 114).  And when trial counsel asked if a woman could ride the motorcycle in question, he responded in the affirmative.  (Tl 114–115).

> [FN 4:  The Defendant's motorcycle was a Yamaha, which he described as "the closest thing to a super sport motorcycle that you can get that's still legal to ride on the street," and which can go "165, 170 miles an hour."  (T 108, 109).]

Under the circumstances, the Court determines that the Defendant has failed to establish a deficient performance for purposes of *Strickland* with respect to this ground. As indicated in the discussion of the Defendant's first ground, the performance of trial counsel cannot be deficient under *Strickland* for failure to use an expert witness when counsel thoroughly cross-examines the State's own witness. *See Belcher*, 961 So. 2d at 250. *See also Reed*, 875 So. 2d at 427–28. As indicated, Green did not even testify as an expert, and on cross-examination trial counsel elicited testimony from Green that he sold motorcycles to women at his dealership "[a]ll the time." (T 114). As also indicated, trial counsel additionally got Green to acknowledge on cross-examination that a woman could drive the motorcycle in question. (T 114–115). The Court further determines that the Defendant is unable to show prejudice for purposes of *Strickland*, since Green indicated on direct that a person whose feet did not touch the ground would still be able to get the motorcycle going, and acknowledged on cross-examination that a woman could drive the motorcycle.

(Ex. N at 727–28). The First DCA affirmed the circuit court's decision without written opinion (Ex. W).

The state court's factual findings with respect to Justin Green's trial testimony are supported by the trial transcript (Ex. E at 107–15). Mr. Green did not testify as an expert; he testified based upon his familiarity with Yamaha motorcycles, and his experience selling motorcycles and riding them "[a]s long as I can remember." (*id.* at 107–08). Green described and demonstrated, on Petitioner's motorcycle which was in the courtroom, how a person would get on the motorcycle, start it, put it in first gear, and start driving it (*id.* at 110–11). Mr. Green testified that if a driver was

too short to touch the ground with his or her feet, they would mount and start the motorcycle the same way, but "it would just be harder to do" (*id.* at 111). Mr. Green testified that the person could simply slide off the seat and touch one foot on the ground to support himself or herself (*id.* at 111–12). Green testified that if a passenger is on the back of the motorcycle, it is "a lot more difficult" to start the motorcycle and "get it going" (*id.* at 113). Mr. Green testified that Petitioner's motorcycle was designed for experienced drivers (*id.*).

On cross-examination, defense counsel asked Mr. Green whether he sold motorcycles to women, and he responded, "All the time" (Ex. E at 114). Defense counsel asked Green if a woman could drive Petitioner's bike, and Green responded yes (*id.* at 115).

Petitioner alleges John Buchanan, the accident reconstructionist, would have testified that Ms. Arnett could have operated the motorcycle even with a passenger of Petitioner's size, and that many women, even of Ms. Arnett's size, choose the motorcycle Petitioner owned. But as the state court pointed out, defense counsel elicited the substance of this testimony from Justin Green.

Further, Petitioner's assertions as to what Mr. Buchanan would have said are not supported by his testimony at the post-conviction evidentiary hearing. What Mr. Buchanan actually said on this subject was the following:

    Q  [by Petitioner's collateral counsel].    At trial the state questioned whether the female would have been able to sit in front and have the bike be supported.  What is your opinion about that?

    A.  Depending on his position on the bike, because that's a rather large seating area so it wouldn't be impossible for two people to be down in the notch of the driver position so then he would be able to position that.  But I, you know, you can hold the bike up also and get it going but it would be consistent that two people would sit in the, in that area because the back seat is a little bit narrower.  So if he wasn't all the way on the seat and he was between there then I don't see a problem for his helping balance the bike as it took off.

(Ex. P at 972–73).  This is far from the definitive statements Petitioner alleges Mr. Buchanan would have made at trial.

Petitioner also alleges Mr. Buchanan would have testified that the fact that the motorcycle was in first gear when it crashed was consistent with Ms. Arnett's driving it, because she did not know how to shift from first gear (*see* Ex. P at 958–59, 971). But Mr. Buchanan also acknowledged, during his testimony at the post-conviction evidentiary hearing, that the motorcycle "was new to the defendant as well" (*see id.* at 997).

Petitioner has not shown that the evidence on the deficient performance question is so one-sided in his favor that the answer is, as the Supreme Court has phrased it, "beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S.

at 103.  Therefore, Petitioner has not satisfied the "unreasonable application" prong on § 2254(d)(1).  Petitioner is not entitled to habeas relief on Ground Three.

D.    Ground Four:  "Defense counsel rendered ineffective assistance of counsel by failing to introduce into evidence the email exchange."

Petitioner alleges during his trial testimony, the prosecutor questioned him about an e-mail exchange between him and Ms. Arnett's mother, and the prosecutor quoted a portion of the e-mail (ECF No. 1 at 13–15).  Petitioner contends "[u]nder the rule of completeness and the 'opening the door' principle," he "had a right" to introduce the entire e-mail into evidence (*id.*).  Petitioner further alleges during closing arguments, the prosecutor misquoted Petitioner's statements in the e-mail by stating that Petitioner told Ms. Arnett's mother, "It's my fault," when Petitioner never actually said that (*id.*).  Petitioner alleges defense counsel was ineffective for failing to introduce the entire e-mail and object to the prosecutor's mischaracterization (*id.*).  Petitioner alleges the result of trial would have been different if defense counsel had done so (*id.*).

Respondent asserts, without conceding or waiving an exhaustion defense, that it "appears" Petitioner exhausted this claim by presenting it in Ground 4 of his third amended Rule 3.850 motion (ECF No. 23 at 48 n.9).  Respondent contends the state court adjudicated the merits of the claim (*id.* at 48).  Respondent contends Petitioner

has not shown that the state court's denial of the claim was contrary to or an unreasonable application of clearly established federal law, or that it rested upon an unreasonable determination of the facts in light of the evidence presented (*id.* at 49–51).

### 1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as part of Ground 4 of his third amended Rule 3.850 motion (Ex. N at 704–08).  The state circuit court adjudicated the claim as follows:

> The Defendant asserts that his trial counsel was ineffective for failure to introduce into evidence the entirety of an email he had sent to the victim's mother.  He alleges that during the State's cross-examination of him, the State, in questioning him about the email, quoted only a portion of it.  He urges that under the evidentiary principles of completeness and "opening the door," *see Brunson v. State*, 31 So. 3d 926,928 (Fla. 1st DCA 2010), he had a right to introduce the entire email into evidence once the State quoted from a portion of it, and argues that trial counsel was ineffective for failing to introduce the entire email, which according to him stated:
>
>> i just got home from the hospital on Friday, so things are hectic right now.  but i will call, i swear.  words cannot express how sorry i am.  if i could trade places with her i would in a heart beat, it should've been me.  I'll have to live with this for the rest of my life.  my thoughts and prayers are with your family and her friends.  I'm so sorry.

(Motion at 12; lower case characters in original). He further alleges that during closing argument, the State again quoted from the email, but this time the State allegedly misquoted it, indicating that the Defendant told the victim's mother "It's my fault" when in fact he never stated such words in the email. He argues that, as a result, he was "severely prejudiced" by trial counsel's failure to introduce the entire email because the closing argument left the jury with the impression that he confessed to the crime, when in fact he was merely expressing sorrow to the victim's mother for her loss. He claims that trial counsel's performance was deficient and resulted in prejudice for purposes of *Strickland*.

The Court finds that the Defendant's fourth ground is refuted by the record and otherwise lacks merit. The following exchange transpired during the State's cross-examination of him:

Q.: And, in fact, you, you remember e-mailing Miss Arnett's mom after this happened?

A.: Yes, I do.

Q.: Do you remember what you said?

A.: I told her that I was very sorry for her loss, that if I could take it all back I would. If I could trade places with her that I would, I believe I told her.

Q.: You said: "Words cannot express how sorry I am. If I could trade places with her I would in a heart beat. It should have been me. I will have to live with this for the rest of my life." You said that because this thing was your fault?

A.: No, I said it because it's a lot of [g]rief for her family, as well as me.

(T 251). It is evident from this exchange that the State quoted directly from the Defendant's email to the victim's mother, and that even though the entire email was not quoted, the quoted portion was not taken out of context with respect to the entire email, because the omitted portion ("i just got home from the hospital on Friday, so things are hectic right now. but i will call, i swear.") would not have changed the meaning of the quoted portion.[FN 5] In short, contrary to the Defendant's position, the evidentiary principles of completeness and "opening the door" referenced by the Defendant were simply not at issue.

> [FN 5: In a footnote, the Defendant additionally suggests that the jury's review of the "email exchange" would have been "beneficial" to him by showing that the victim's mother "expressed concern" for him. However, the above-quoted omitted portion does not clearly show that; if there is another email that does, the Defendant does not quote from or otherwise specifically reference it. In any case, whether the victim's mother expressed concern for the Defendant was simply not a material issue in the instant case and accordingly would not furnish a possible basis for postconviction relief.]

It is also evident from this exchange that the Defendant acknowledged that he had written the portion of the email that was quoted by the State. As the State points out in its response, the ensuing dispute was merely over what the words in his email meant. The State was entitled to ask the Defendant whether the reason he had written the words in the email was that the accident was his fault. As indicated, during the exchange the Defendant in his answer unequivocally answered in the negative, and clearly explained that he wrote the words in the email not because the accident was his fault, but rather because her family had been through a lot of grief. (T 251). He further testified that he was supposed to "touch base" with the victim's mother by telephone, and if they had connected, he would have told her what happened. (T 252–53). Thus, when the State later stated in closing argument that the Defendant's email said "It's my fault," the State was

not misquoting the words of the email itself, but was rather repeating its interpretation of the email to the jury, which it was entitled to do as that constituted a fair comment on the evidence, as well as a permissible logical inference drawn from the evidence.  *See Wade v. State*, 41 So. 3d 857, 868 (Fla. 2010), *cert. denied*, 131 S. Ct. 1004 (2011) ("fair comment" on the evidence does not constitute "improper argument"); *Franqui v. State*, 804 So. 2d 1185, 1195 (Fla. 2001) (during argument, logical inferences may be drawn).  Because the Defendant's testimony on cross-examination was the last testimony that the jury heard, the jury would have recognized that the State was arguing about the meaning of the email, and not its literal wording.  In short, the Defendant has not demonstrated either a deficient performance or prejudice under *Strickland* due to trial counsel's failure to introduce the entire email into evidence at trial.

(Ex. N at 728–29).  The First DCA affirmed the decision without written opinion (Ex. W).

With respect to defense counsel's failure to introduce the e-mail into evidence based upon the "rule of completeness" and "opening the door" principle, the state court already answered whether these state-law based evidentiary principles provided a meritorious basis for admission—they did not.  Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of *Strickland*, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law."  *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate

counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted)[3]; *see also Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been

---

[3] *Alvord* was superseded by statute on other grounds as noted in *Hargrove v. Solomon*, 227 F. App'x 806 (11th Cir. 2007).

resolved under Florida state law had [petitioner's counsel] done what [petitioner]

argues he should have done . . . .  It is a 'fundamental principle that state courts are

the final arbiters of state law, and federal habeas courts should not second-guess

them on such matters.'") (alterations in original) (quoting *Agan v. Vaughn*, 119 F.3d

1538, 1549 (11th Cir. 1997)).

Here, the state court has already determined that defense counsel did not have

a meritorious basis for seeking admission of the entire e-mail based upon the "rule

of completeness" and "opening the door" principles.  This court must defer to the

state court's determination of state law.  The failure by defense counsel to seek

admission of the e-mail cannot be deemed deficient performance, and Petitioner

cannot show he was prejudiced by counsel's failure to raise this issue, because it had

no arguable basis for success.  Therefore, Petitioner is not entitled to relief on this

aspect of Ground Four.

Petitioner also faults defense counsel for not objecting to the prosecutor's

comments, during closing arguments, that Petitioner stated, "It's my fault" in the

email.  Under Florida law, the standard for reviewing prosecutorial comments is the

following:

> Wide latitude is permitted in arguing to a jury.  Logical inferences may
> be drawn, and counsel is allowed to advance all legitimate arguments.
> . . .  A new trial should be granted when it is "reasonably evident that

> the remarks might have influenced the jury to reach a more severe
> verdict of guilt than it would have otherwise done." Each case must be
> considered on its own merits, however, and within the circumstances
> surrounding the complained-of remarks.

*Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982) (quoting *Darden v. State*, 329 So. 2d

287, 289 (Fla. 1976)) (other citations omitted). This state rule is essentially the same

as the federal due process standard governing allegedly improper argument by the

prosecution. A prosecutor may argue both facts in evidence and reasonable

inferences from those facts. *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir.

1985) (citations omitted). "[T]he limits of proper argument find their source in

notions of fairness, the same source from which flows the right to due process of

law." *Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). "The relevant question

is whether the prosecutor's comments 'so infected the trial with unfairness as to

make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477

U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly v.

DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). Thus, to

establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the

prosecutor's comments must have been improper; and (2) the comments must have

rendered the trial fundamentally unfair. *See United States v. Eyster*, 948 F.2d 1196

1206 (11th Cir. 1991) (citations omitted); *Dessaure v. State*, 891 So. 2d 455, 464–

65 (Fla. 2004) (an order granting mistrial is required only when the error upon which

it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to

ensure that the defendant receives a fair trial).

The prosecutor made the allegedly objectionable comments near the end of

his first closing argument:

> The Defendant also wrote a letter that you heard, an e-mail, to
> the victim's mother. In that e-mail he said "Words can't express how
> sorry I am. If I could trade places with her, I would. It's my fault. It's
> my fault." Those are his words. If he wasn't driving, how was it his
> fault? It's his fault because he knows he was driving, he knows what
> happened. He knows everything that happened. All that stuff he told
> you yesterday, he, he knows he was intoxicated, there's really nothing
> he can do about [sic], even though he says he only had a couple of
> drinks and his blood alcohol somehow got to a 187. But he knows he's
> intoxicated, there's no real doubt as to the way the motorcycle is being
> driven, is it being driven in a wanton disregard for the safety of others,
> so what do you go with, you go with let's blame it on the dead lady.
> She can't come in here today and tell you what happened. Let me say
> she was driving, despite the fact there was an eye witness that was
> behind me 10 seconds before this accident happened. That's all I got,
> let's blame it on the dead woman, case closed. That's what he did when
> he got up here on the stand yesterday. He's blaming it on a dead lady
> and wants you to believe that he's a good Samaritan and just let's
> anybody learn on his brand new motorcycle, how to drive it.
>
> These are all of the different ways that we have proven to you
> that the Defendant was the one driving. If you think about proving
> something beyond a reasonable doubt, I like to tell the jury think about
> it like a step ladder, once you get to a certain rung in your mind the
> State has proven its case beyond a reasonable doubt. I would submit
> to you that an eye witness should do it for you, but if the eye witness does
> not do it for you, ask yourself whose motorcycle it was? Ask yourself

about the relationship between Miss Arnett and the Defendant. Ask yourself about how new the motorcycle was or this idea that he would teach her how to ride on his new motorcycle for experienced riders, consider her height, consider the weight of the motorcycle, consider the fact the Defendant's from out of town, that the victims [sic] from in town, there's no way she is gonna [sic] flee down a road she knows dead-ends, consider the maneuverability to get around those motorcycles, an experienced rider is the one who is gonna [sic] be able to do it, consider the fact that the Defendant ended up farther down the road, about 30 feet, and you had a person who is trained in reconstructing accidents tell you that in his training and experience that indicates that the person driving held on longer because they got handle bars. Consider his statement after the fact, "It was my fault." All that stuff about him feeling sorry for the family and all, uh-uh. If he would have felt sorry for family, he would have said, I am sorry, I didn't mean for her to get on it and drive it. If I would have known that she couldn't drive it, I wouldn't have let her do it but he put it's my fault. It's his fault, because he was driving and he knows it. Those are the ways that we have proven to you that he was driving.

(Ex. G at 295–97).

In response, defense counsel argued that Petitioner's testimony was truthful:

The State is accusing Mr. Wood of lying. He's sure Mr. Wood has lied to you about everything in this case. Well, if Mr. Wood is lying, he's not doing a very good job. Why didn't he just blame Miss Arnett for everything. He knew her blood alcohol level was much higher than his. He could have just said she told [him] she could ride a bike, that she left out of Miss Newby's driving and that she fled from the officer and got him hurt like this and killed herself. Why couldn't he say that, she's not here, Mr. Register [the prosecutor] is right, she's dead. There's nothing she can say, he can say whatever he wants. . . . He's being honest with you, he's telling you the truth. You listened to him, he's telling you the truth in this case. He's the only person that knows what happened, and he doesn't know exactly why the accident happened either, but he knows he was not driving.

(Ex. G at 302–03).   The prosecutor did not repeat the allegedly objectionable comment during his second closing argument (*see id.* at 305–08).

The jury heard the complete context of Petitioner's statements in the e-mail, "Words cannot express how sorry I am.  If I could trade places with her I would in a heart beat.  It should have been me.  I will have to live with this for the rest of my life."  And the jury heard it not once, but twice (during the prosecutor's cross-examination of Petitioner and during the prosecutor's closing).   The prosecutor suggested those words were an admission of fault.  The jury could reasonably infer an admission of guilt from Petitioner's e-mail, and that is what the prosecutor urged the jury to do.  The jury could also reasonably reject the prosecutor's suggestion and believe Petitioner's explanation of his e-mail—that it was not an admission of fault, but an expression of his sorrow for the family's loss and grief.

Petitioner has not shown that no fairminded jurist could have concluded, as the circuit court judge and the three-judge panel of the First DCA did, that defense counsel was not deficient for failing to seek admission of the "entire" e-mail and failing to object to the prosecutor's comments during closing.  Having failed to make this showing, Petitioner has not demonstrated that the state court's adjudication of

the IATC claim was an unreasonable application of *Strickland*.  Petitioner is not

entitled to habeas relief on Ground Four.

   E.   Ground Five:  "Defense counsel rendered ineffective assistance of
counsel by failing to object to improper comments made by the prosecutor."

Petitioner identifies several comments during the prosecutor's closing

arguments, and argues that defense counsel should have objected to the comments,

requested a curative instruction, and moved for a mistrial (ECF No. 1 at 17–19).

Respondent asserts, without conceding or waiving an exhaustion defense, that

it "appears" Petitioner exhausted this claim by presenting it in Ground 7 of his third

amended Rule 3.850 motion (ECF No. 23 at 58 n.10).  Respondent contends the state

court adjudicated the merits of the claim (*id.* at 58).  Respondent contends Petitioner

has not shown that the state court's denial of the claim was contrary to or an

unreasonable application of clearly established federal law, or that it rested upon an

unreasonable determination of the facts in light of the evidence presented (*id.* at 59–

60).

   1.   Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

   2.   Federal Review of State Court Decision

Petitioner presented this claim as Ground 7 of his third amended Rule 3.850

motion (Ex. N at 710–14).  The state circuit court adjudicated the claim as follows:

> The Defendant argues that in several instances, his trial counsel
> was ineffective for failing to object to allegedly improper comments
> from the State during closing arguments, and for failing to request a
> curative instruction or mistrial based on them.  According to the
> Defendant, trial counsel failed to object a number of times during
> closing.  The Defendant urges that trial counsel's failure in this respect
> was deficient and resulted in prejudice.  The Court will address each
> main instance in turn.
>
> First, the Defendant alleges that the prosecutor opined that it
> would have been impossible for the victim to drive the motorcycle, and
> then proceeded to "'testify" that he was only 5'6" tall.  He states that the
> prosecutor performed a demonstration for the jury by seating himself
> on the motorcycle, and then indicating that it might fall on him and that
> he needed the assistance of the bailiff to support it.  The prosecutor
> stated, "I am on my tip toes, a woman shorter than me has to do this
> while the Defendant gets on the back." (T 291).  However, according
> to the Defendant, there was no testimony regarding the height of the
> prosecutor or the length of his inseam, or the inseam of the victim.
> Thus, the Defendant urges that the prosecutor's demonstration
> constituted additional testimony from the prosecutor for the jury to
> consider, and urges that trial counsel should have objected and
> requested a curative instruction or a mistrial.  He further urges that the
> prosecutor's statement about needing assistance to hold up the bike
> constituted improper comment that lacked record support and was
> prejudicial.  In the Defendant's view, the prosecutor was effectively
> testifying that he is larger than the victim and that he would be unable
> to hold up the motorcycle alone.  The Defendant also notes that
> prosecutor additionally stated that with the Defendant on the back, the
> victim would have been required to support 560 pounds (the joint
> weight of the Defendant and the motorcycle) and would have been
> required to do so on her tiptoes.  The Defendant complains, however,
> that these facts were not in evidence, as there was never any evidence

that the Defendant could not touch the ground from the back of the motorcycle in order to assist the victim in supporting it. The Defendant urges that these facts were all objectionable and prejudicial because the demonstration and additional testimony offered by the prosecutor were intended to convince the jury, without any opportunity for rebuttal evidence, that the victim could not have driven the motorcycle.

As the Florida Supreme Court held in *Floyd v. State*, 913 So. 2d 564, 576 (Fla. 2005), "A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding." *See also Dessaure v. State*, 89 l So. 2d 455, 464–65 (Fla. 2004). For a new trial to be warranted, the comments "must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." *Spencer v. State*, 645 So. 2d 377, 383 (Fla. 1994). Moreover, as *Franqui v. State*, 804 So. 2d 1185, 1195 (Fla. 2001) explained,

> [W]ide latitude is afforded counsel during argument. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. The standard jury instructions contain cautions that while the arguments of counsel are intended to be helpful and persuasive, such arguments are not to be taken as sources of the law or evidence. (Citations omitted.)

The Court finds that this portion of the Defendant's claim is refuted by the record and otherwise lacks merit. There was ample evidence with respect to the victim's height. During the direct examination of Laura Thomas, the victim's sister, the prosecutor asked if she knew how tall the victim was, and she responded that the victim was shorter than her. The prosecutor then asked her whether the victim was shorter or taller than him, and she replied that the victim was "[s]horter, for sure." (T 104). Subsequently, the Defendant was asked on cross-examination whether the victim was shorter than the

prosecutor. (T 241). The Defendant responded by asking the prosecutor, "How tall are you?" (T 241). The prosecutor responded, "I'm five foot six," and asked, "[S]he's shorter than me?" (T 241). The Defendant responded, "Yes, sir." (T 241). However, the Defendant did indicate that he "could not recall" whether the victim's feet "could touch or not" and suggested to the prosecutor that the victim's legs "may have been longer" than his. (T 243). Additionally, Dr. Michael D. Hunter, the medical examiner, testified that the victim was 64 inches (or 5'4") tall, and weighed 140 pounds. (T 206). As for the Defendant's complaint about the prosecutor's demonstration, during which he asked the bailiff to help support the motorcycle, the record does not reflect that the prosecutor was effectively testifying that he was larger than the victim and would have been unable to hold up the motorcycle alone. Rather, the trial transcript simply reflects that the prosecutor said, "Luther, if you wouldn't mind sitting here in case it falls over on me." (T 291). The prosecutor did not say that he was unable to support the motorcycle himself. Finally, as for the Defendant's claim that it was improper for the prosecutor to state that, with the Defendant on the back, the victim would have been required to support 560 pounds, the joint weight of the Defendant and the motorcycle, and to do so on her tiptoes, contrary to his position there was record evidence to allow the prosecutor's argument. Green, the manager of Yamaha Seadoo, testified that Defendant's motorcycle weighed just under 400 pounds. (T 109). On cross-examination, the Defendant agreed that the motorcycle weighed 400 pounds, and he testified that he weighed 160 or 170 pounds. (T 243). In short, the complained-of comments were supported by the record, or were at least logical inferences that could be drawn from the evidence. *See Franqui*. They hardly deprived the Defendant of a fair trial. *See Floyd*; *Dessaure*; *Spencer*. Consequently, the Defendant has not demonstrated deficient performance or prejudice under *Strickland* due to trial counsel's failure to object to them.

Next, the Defendant alleges that the prosecutor argued, "[T]hink for a second what road they fled down. I asked everybody in jury selection is everybody familiar with the St. Andrew's State Park area, everybody raised their hands." (T 292). The Defendant complains that this argument was improper and prejudicial. In his view, the defense

was unable to make an effective counter argument based on the evidence because the jurors had already, at the prosecutor's instruction, thought about the "road they fled down," using their own individual recollection and experiences rather than the evidence at trial. Thus, he urges that trial counsel was ineffective for failure to object.

The Court finds that this portion of the Defendant's claim lacks merit as well, as his argument is refuted by the record. From reviewing the prosecutor's argument as a whole, it is evident that when he made the statement, he was noting that the road the motorcycle had fled down was a dead-end street, which then enabled him to argue that the victim, who was a local and who had been to the park many times, would not have attempted to flee from law enforcement down a dead-end street, while the Defendant, who was visiting from Georgia, might have done so because he was not similarly familiar with the road. (T 292–93). Contrary to his position, there was ample evidence at trial that the road dead-ended into St. Andrews State Park, as well as evidence that the victim had been to the park dozens of times, whereas the Defendant had never been there before. (T 35–36; 42; 48; 106; 239). Additionally, the prosecutor entered both a map of the area and a video of the route of pursuit into evidence, and the jury was able to view both. (T 32–33; 58). There is simply no evidence that any of the jurors improperly relied on their own recollection rather than the ample evidence that was presented at trial with respect to the dead-end road. In short, the complained-of comment was entirely proper in view of the evidence adduced at trial, and it hardly deprived the Defendant of a fair trial. *See Floyd*; *Dessaure*; *Spencer*. Consequently, the Defendant has not demonstrated a deficient performance or prejudice under *Strickland* as a result of trial counsel's failure to object.

The Defendant then reprises a portion of his argument in ground four, urging that during closing argument the prosecutor misquoted the email from the Defendant to the victim's mother by stating that in the email, the Defendant said "It's my fault" when in fact he never used such words. The Defendant complains that the alleged misquotation improperly "manipulated" the jury to believe that he had confessed to the crime. Thus, he urges that trial counsel was ineffective for failure

to object and request a mistrial.  He also urges that he was prejudiced as a result.

The Court finds that this portion of the Defendant's argument also lacks merit.  As explained in the discussion of ground four, the prosecutor did not actually misquote the Defendant's email when making the statement "It's my fault."  Rather, the statement was merely the prosecutor's interpretation of the words in his email and as such was a fair comment on the evidence, *see Wade*, 41 So. 3d at 868, as well as a permissible logical inference from the evidence, *see Franqui*, 804 So. 2d at 1195.  As a result, the Defendant has not demonstrated a deficient performance or prejudice under *Strickland* due to trial counsel's failure to object.

Finally, the Defendant argues that the prosecutor made several other improper statements.  He complains that the prosecutor improperly told the jury, "You either believe the officer who testified who was stone cold sober that night had no reason, no interest in this case other than doing his job, or you believe the Defendant."  (T 281–82).  In the Defendant's view, this statement improperly bolstered the officer's testimony, *see Servis v. State*, 855 So. 2d 1190, 1195 (Fla. 5th DCA 2003), and was otherwise improper.  *See Freeman v. State*, 717 So. 2d 105 (Fla. 5th DCA 1998) (prosecutor impermissibly shifted the burden of proof when he told jurors that if they believed the police officers instead of the defendant, then they should find the defendant guilty and that "the question" was who they wanted to believe); *Clewis v. State*, 605 So. 2d 974, 975 (Fla. 3d DCA 1992) ("[I]t is legally incorrect to ask the jury to decide, as the test for reasonable doubt, who is the liar as between the accused and a police officer.").  He also complains that the prosecutor improperly expressed his personal opinion regarding the case and the credibility of the witnesses throughout his argument, and improperly ridiculed his defense with the following comment:

> [S]o what do you go with, you go with let's blame it on the dead lady.  She can't come in here today and tell you what happened.  Let me say she was driving, despite the

fact that there was an eye witness that was behind me 10 seconds before this accident happened. That's all I got, let's blame it on the dead woman, case closed. That's what he did when he got up here on the stand yesterday. He's blaming it on a dead lady and wants you to believe that he's a good Samaritan and just let's anybody learn on his brand new motorcycle, how to drive it.

(T 295–96). *See Servis*, 855 So. 2d at 1194–95 (prosecutor may not ridicule a defendant's theory of defense, and an attorney may not express personal opinion on merits of case or credibility of witnesses).

The Court determines that the Defendant is not entitled to relief on this final portion of his claim. To be sure, the prosecutor's closing argument was forceful, and some of the prosecutor's statements within it, as referenced by the Defendant, might have come close to being technically objectionable. However, the Court finds that the statements did not involve improper bolstering of the officer's testimony, shifting of the burden of proof, expressing the prosecutor's personal opinion regarding the case and the credibility of the witnesses, or ridiculing the Defendant's theory of defense. Rather, the prosecutor's statements, particularly when viewed within the context of the closing argument as a whole, involved fair comments on the evidence, *see Wade*, 41 So. 3d at 868, as well as permissible logical inferences from the evidence; *see Franqui*, 804 So. 2d at 1195. They did not deprive the Defendant of a fair trial. *See Floyd*; *Dessaure*; *Spencer*. Therefore, the Defendant has not demonstrated a deficient performance or prejudice under *Strickland* as a result of trial counsel's failure to object.

(Ex. N at 731–34). The First DCA affirmed the circuit court's decision without written opinion (Ex. W).

The state court's factual findings are supported by the record, and its analysis of each of the comments identified by Petitioner is well-reasoned. The undersigned

adds only the following with respect to the last two prosecutorial comments identified by Petitioner.  As the state court determined, the comment, "You either believe the officer who testified who was stone cold sober that night had no reason, no interest in this case other than doing his job, or you believe the Defendant" was not improper.

Attempts to bolster a witness by vouching for his or her credibility are improper "if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility." *Eyster*, 948 F.2d at 1206 (citing *United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983)).  A jury could believe that the prosecutor personally believed in the witness' credibility "if the prosecutor either places the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony." *Id.* (citation omitted).  But "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991).  Furthermore, when the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment is not improper.  *United States v. Granville*,

716 F.2d 819, 822 (11th Cir. 1983) (finding no prosecutorial misconduct where prosecutor, in effort to support testimony of two government witnesses, only pointed to matters in evidence:  the demeanor of one witness and testimony of support witnesses, as well as a tape recording corroborating the testimony of another) (citations omitted).

Petitioner's case came down to whether the jury believed Sergeant Guilford's testimony, that he saw a female passenger and a male driver, or Petitioner's testimony, that he was the passenger and Ms. Arnett was the driver.  The prosecutor properly commented on the reasons the jury should find Sergeant Guilford's testimony more credible that Petitioner's, and those reasons were supported by the evidence.  There was no evidence that Sergeant Guilford was anything but sober when he observed Petitioner's motorcycle on September 28. 2008; whereas the jury heard testimony that Petitioner's blood-alcohol level was at least .183.   And Petitioner obviously had an interest in the outcome of his own criminal case; whereas there was no evidence that Sergeant Guilford had any interest in the outcome. Defense counsel had no basis to object to the prosecutor's comments as improper bolstering.

With respect to the prosecutor's characterizing the defense as "blaming the dead lady," Petitioner contends this was improper ridiculing.  The prosecutor may

not "inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law." *Jones v. State*, 612 So. 2d 1370, 1374 (Fla. 1993) (internal quotation marks and citation omitted). Further, prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Here, the prosecutor was simply commenting, albeit in a somewhat pejorative manner, that Petitioner's defense theory was the most convenient and essentially the only one available (given the undisputed evidence that the motorcycle was his, he was on the motorcycle when it crashed, and he admittedly had consumed alcohol prior to the crash). And even if it was improper, the state court reasonably concluded the prosecutor's comments did not deprive Petitioner of a fair trial.

Petitioner has failed to demonstrate that the state court unreasonably applied *Strickland* in adjudicating his IATC claim concerning defense counsel's failure to challenge the propriety of the prosecutor's comments during closing arguments. Petitioner is thus not entitled to habeas relief on Ground Five.

F.    Ground Six:  "Defendant was convicted and sentenced in violation of the Double Jeopardy Clause."

Petitioner contends his convictions of DUI Manslaughter and DWLS Causing Death violate double jeopardy principles, because there can be but one penalty imposed for causing the death of a single victim (ECF No. 1 at 20–21).  Petitioner contends defense counsel was ineffective for failing to raise this issue at trial or sentencing (*id.* at 21).  Petitioner concedes he did not present a double jeopardy claim on direct appeal (*id.* at 20).  Petitioner provides conflicting information regarding whether he exhausted the claim in the Rule 3.850 proceeding, first stating he presented the claim (*id.* at 20), but then stating post-conviction counsel failed to present it (*id.* at 21).  Petitioner contends he is entitled to federal review of the claim pursuant to *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) (*id.*).

Respondent contends Petitioner's double jeopardy claim is unexhausted (ECF No. 23 at 61–62).  Respondent contends the only instance in which Petitioner alleged a double jeopardy violation was in a Rule 3.800(a) motion to correct illegal sentence, but the state courts summarily denied the motion based upon the state procedural rule that the claim was not cognizable in a Rule 3.800(a) motion (*id.*).  Respondent contends Petitioner cannot now take a second direct appeal to present a double

jeopardy claim and, although the claim is cognizable under Rule 3.850, any such motion would be barred as successive and untimely (*id.* at 62). Respondent alternatively contends Petitioner's double jeopardy claim is without merit (*id.* at 63).

With respect to Petitioner's related IATC claim, Respondent contends the claim is not exhausted, because it was not presented in the Rule 3.850 proceeding (ECF No. 23 at 64). Respondent contends any attempt to now present the claim would be barred as successive and untimely; therefore, the claim is procedurally barred (*id.*). Respondent contends it "appears" that Plaintiff has shown cause and prejudice under *Martinez*, because Petitioner's IATC claim is substantial (*id.* at 64– 69). Respondent states if Petitioner's post-conviction counsel had presented the claim, there is a reasonable probability the post-conviction court would have deemed Petitioner's trial counsel ineffective for failing to argue that Petitioner's convictions violated Florida's "single homicide rule" (*id.*). Respondent contends Petitioner's IATC claim is thus subject to de novo review in federal habeas (*id.* at 69). Respondent concedes that it "appears" Petitioner is entitled to a conditional grant of habeas corpus with respect to his claim that trial counsel was ineffective for failing to raise a double jeopardy challenge based upon Florida's single homicide rule (*id.*). Respondent contends the appropriate remedy is to vacate the DWLS Causing Death conviction and sentence (*id.*).

1.    Double Jeopardy Claim

The state court record supports Respondent's exhaustion defense.  Petitioner did not present a double jeopardy claim on direct appeal (*see* Ex. H) or in the Rule 3.850 proceeding (*see* Ex. N at 695–717)  Although Petitioner presented a double jeopardy claim in his Rule 3.800(a) motion to correct illegal sentence (Ex. BB at 1–3), the state circuit court summarily denied the motion on the ground that the claim was not cognizable in a Rule 3.800(a) motion, because Petitioner challenged his convictions, not just his sentences (Ex. BB at 17).  The First DCA affirmed the lower court's application of the procedural bar (Ex. CC).

The Florida Supreme Court has held that a sentence that has been unconstitutionally enhanced in violation of the double jeopardy clause is illegal and, therefore, may be corrected under Rule 3.800(a).  *See Hopping v. State*, 708 So. 2d 263, 265 (Fla. 1998).  In the instant case, however, Petitioner's double jeopardy claim concerns not only his sentences, but his convictions as well.  A defendant's double jeopardy claim challenging his convictions, rather than just his sentences, is not cognizable in a Rule 3.800(a) motion, because correcting the alleged double jeopardy violation would require vacating an underlying conviction.  *See George v. State*, 213 So. 3d 966, 967 (Fla. 1st DCA 2015) (emphasis added); *State v. Williams*, 854 So. 2d 215 (Fla. 1st DCA 2003); *Wiley v. State*, 604 So. 2d 6, 7 (Fla. 1st DCA

1992). The state procedural rule upon which the state court rejected Petitioner's double jeopardy claim was firmly established and regularly followed. Therefore, the federal court will honor the procedural bar.

Any attempt by Petitioner to return to state court to exhaust a double jeopardy claim would be futile, because Petitioner cannot take a second direct appeal, and a Rule 3.850 motion would be barred as untimely and successive. *See* Fla. R. Crim. P. 3.850(c), (h). Therefore, the claim is procedurally barred from federal review.

Petitioner's reliance upon *Martinez* as cause for the procedural default of his federal double jeopardy claim is misplaced. "By its own emphatic terms, the Supreme Court's decision in *Martinez* is limited to claims of <u>ineffective assistance of trial counsel</u> that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel." *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013) (holding that *Martinez* did not apply to claim that petitioner was mentally incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986)) (emphasis added); *see also Davila v. Davis*, — U.S.—, 137 S. Ct. 2058, 2065, 198 L. Ed. 2d 603 (2017) (declining to extend *Martinez* to a procedurally defaulted claim of ineffective assistance of appellate counsel). Therefore, Petitioner has failed to demonstrate he is entitled to a federal merits review of the federal double jeopardy claim asserted in Ground Six.

2.    IATC Claim

Petitioner did not exhaust an IATC claim in state court based upon trial counsel's failure to argue that Petitioner's convictions for DUI Manslaughter and DWLS Causing Death violated double jeopardy principles (*see* Ex. BB at 695–717). Petitioner would now be procedurally barred from presenting the claim in state court, because a second Rule 3.850 motion would be subject to dismissal as untimely and successive.  *See* Rule 3.850(c), (h).

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right. *Wainwright v. Sykes*, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).  To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray*, 477 U.S. at 488). Before its 2012 decision in *Martinez*, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause.  *See Coleman v. Thompson*, 501 U.S. 722, 752–53, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).  *Martinez* created a limited, equitable exception to Coleman where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-

counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." *Martinez*, 566 U. S. at 14 (citations omitted). Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688).

In *Hittson*, the Eleventh Circuit explained:

> [T]he merits of the underlying claim is only a part of the *Strickland* analysis. With unlimited time and the benefit of hindsight, a petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised. However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. *Murray*, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983). "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of

counsel to present the client's case in accord with counsel's professional evaluation." *Id.* at 751, 103 S. Ct. at 3313.

As we have explained, *Strickland* instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689–90, 104 S. Ct. at 2065–66. To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Thus, to show that his habeas counsel failed to provide the level of representation required by *Strickland*, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

*Hittson*, 759 F.3d at 1263 (footnote omitted). The Eleventh Circuit then explained *Martinez*'s "substantial claim" requirement as requiring a petitioner to demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Hittson*, 759 F.3d at 1269–70 (citations omitted).

Respondent concedes Petitioner has satisfied *Martinez* with respect to his IATC claim based upon trial counsel's failure to argue that Petitioner's convictions and sentences for DUI Manslaughter and DWLS Causing Death violate Florida's "single homicide rule," which "affords a second tier of double jeopardy protection"

(ECF No. 23 at 66–69 (citing *McCullough v. State*, 230 So. 3d 586, 592 (Fla. 2d DCA 2017)).

The undersigned agrees.  Florida's "single homicide rule" was first adopted by the Florida Supreme Court in *Houser v. State*, 474 So. 2d 1193, 1197 (Fla. 1985) to preclude dual convictions for DWI manslaughter and vehicular homicide based upon a single death.  *Id.*  The *Houser* court recognized that the two crimes passed muster under *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), but the court explained that "*Blockburger* and its statutory equivalent in section 775.024(1), Fla. Stat. (1983), are only tools of statutory interpretation which cannot contravene the contrary intent of the legislature." *Houser*, 474 So.2d at 1196. Because "Florida courts have repeatedly recognized that the legislature did not intend to punish a single homicide under two different statutes," these dual convictions were impermissible regardless of whether the offenses satisfy the *Blockburger* test.  *Id.* at 1197.  The Florida legislature's statutory codification of the *Blockburger* test, in Florida Statutes § 775.021(4), did not affect the Florida Supreme Court's jurisprudence on the single homicide rule.  *See State v. Chapman*, 625 So. 2d 838, 839–40 (Fla. 1993).

The single homicide rule "is based on notions of fundamental fairness which recognize the inequity that inheres in multiple punishments for a singular killing."

*Gordon v. State*, 780 So.2d 17, 25 (Fla. 2001), *receded from on other grounds by Valdes v. State*, 3 So. 3d 1067 (Fla. 2009).  In *Cooper v. State*, the Florida Supreme Court applied the single homicide rule to hold that dual convictions for DUI Manslaughter and Driving While License Suspended Causing Death violate double jeopardy when there is only a single death.  634 So. 2d at 1075.  Defendant Cooper had rear-ended a vehicle while driving under the influence, and the crash caused the death of the other vehicle's passenger.  *See Cooper v. State*, 621 So. 2d 729, 730 (Fla. 5th DCA 1993), *approved*, 634 So. 2d 1074 (Fla. 1994).  The Florida Supreme Court determined that the defendant could be convicted of both DUI Manslaughter and DWLS as long as the latter charge was not enhanced for causing death as provided in Florida Statutes § 322.34(3) (1991).[4]  *Cooper*, 634 So. 2d at 1075.

The undersigned agrees with the parties that Petitioner has stated a "substantial" IATC claim under *Martinez* (*see* ECF No. 23 at 68), according to the Eleventh Circuit's definition of that that standard (i.e., that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.").  *Hittson*, 759 F.3d at 1269–70.  The court also agrees with the parties that no reasonable post-conviction counsel would have failed to raise this

---

[4] Section 322.34(3) was later renumbered as § 322.34(6), and is the section under which Petitioner was charged and convicted.

IATC claim in a Rule 3.850 proceeding, and had post-conviction counsel done so, there is a reasonable probability the post-conviction court would have granted post-conviction relief (*see* ECF No. 23 at 68).  Petitioner's having established cause and prejudice necessary to excuse his procedural default, he is entitled to a federal merits review of his IATC claim.

Respondent makes a qualified concession that Petitioner "appears" to be entitled to a conditional grant of federal habeas relief based upon trial counsel's failure to argue a double jeopardy violation under Florida's single homicide rule (*see* ECF No. 23 at 69).   The undersigned concludes, without qualification, that considering the Florida Supreme Court's decision in *Cooper*, no competent trial counsel would have failed to assert a "single homicide rule" challenge to Petitioner's convictions for DUI Manslaughter and DWLS Causing Death.   Additionally, if Petitioner's trial counsel had done so, there is a reasonable probability Petitioner would not have been convicted and sentenced for DWLS Causing Death, and instead would have been convicted of the lesser included offense of DWLS. [5]

---

[5] Petitioner's verdict included a lesser included offense of Driving While License Suspended or Revoked (Ex. A at 79).  By finding Petitioner guilty of the greater offense, the jury necessarily found that the State proved the lesser included offense beyond a reasonable doubt.

Case No.:  5:17cv163/MCR/EMT

The remaining question is the proper remedy for counsel's ineffectiveness in failing to assert the "single homicide rule" challenge. "Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Lafler v. Cooper*, 566 U.S. 156, 170, 132 S. Ct. 1376, 182 L. Ed. 2d 388 (2012) (citing *United States v. Morrison*, 449 U.S. 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981)). Thus, a remedy must "neutralize the taint of a constitutional violation, . . . while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution." *Lafler*, 566 U.S. at 170 (internal quotation marks and citations omitted). The federal court's decision should leave open to the state trial court how best to exercise its discretion in all the circumstances of the case. *See Lafler*, 566 U.S. at 175 (concluding that appropriate remedy for federal habeas petitioner's success on claim of ineffective assistance of counsel based upon counsel's deficient advice during plea negotiations was for the federal court to order the State to reoffer the plea agreement, and then permit the state trial court to exercise its discretion).

The Eleventh Circuit has held that the proper remedy for a double jeopardy violation is to set aside the conviction and sentence for the lesser offense (here, DWLS Causing Death), not the greater (DUI Manslaughter). *See Williams v.*

*Singletary*, 78 F.3d 1510, 1517 (11th Cir. 1996) (citing *State v. Barton*, 523 So.2d

152, 153 (Fla. 1988); *Febles v. State*, 654 So. 2d at 615, 615 (Fla. 3d DCA 1995);

*Bradley v. State*, 540 So. 2d 185, 187 (Fla. 5th DCA 1989); *Slater v. State*, 543 So.

2d 424, 425 (Fla. 5th DCA 1989); *Spradley v. State*, 537 So. 2d 1058, 1061 (Fla. 1st

DCA 1989)).

Here, the only harm Petitioner has suffered thus far as a result of his trial

counsel's ineffectiveness is entry of the DWLS Causing Death conviction. He has

not served any part of the sentence for that conviction, because his sentence was a

5-year period of probation to be served consecutively to his prison sentence on the

DUI Manslaughter conviction. Petitioner is still serving his prison term for the DUI

Manslaughter conviction. The appropriate remedy is to require Respondent to

produce Petitioner in the state trial court for a hearing to remedy the constitutional

violation. At that hearing, the State may request that the trial court adjudicate

Petitioner guilty of the lesser included offense of DWLS, or the State may dismiss

the charge altogether. The parties could then determine whether Petitioner's

sentencing scoresheet requires recalculation, and the trial court could exercise its

discretion with respect to resentencing. *See Cooper*, 634 So. 2d at 1074–75; *Daniel

v. State*, — So. 3d —, 2019 WL 1986209, at *2 (Fla. 1st DCA 2019) (holding that

defendant's convictions of vehicular homicide and fleeing or eluding were barred by

Florida's judicially-created "single homicide rule" because, due to how the jury was instructed on the fleeing or eluding count, both convictions were necessarily based on the death of the same victim, and holding that appropriate remedy was to vacate the first degree fleeing or eluding conviction and remand for entry of judgment of conviction on lesser included offense of second-degree fleeing or eluding) (citing *Cooper*); *Martinez v. State*, 251 So. 3d 306, 307 (Fla. 2d DCA 2018) (holding that convictions for driving with suspended license and causing death and DUI manslaughter violated single homicide rule, where convictions concerned the same victim, and holding that appropriate remedy was to vacate the conviction for driving with suspended license causing death and resentence defendant on all remining counts with a corrected scoresheet).

G.    Ground Seven:  "Actual Innocence"

In Petitioner's reply, he expressly states he is abandoning Ground Seven (*see* ECF No. 31 at 2).  The court thus deems Ground Seven withdrawn.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be

**CONDITIONALLY GRANTED** on the ineffective assistance of trial counsel

claim presented in Ground Six, and that Respondent be required to produce

Petitioner in the state trial court, within a time set by the district judge, for a hearing

to vacate Petitioner's conviction and sentence on Count II and take any other

appropriate action.

2.      That the habeas petition (ECF No. 1) be **DENIED** on all of Petitioner's

other claims.

3.      That a certificate of appealability be denied.

At Pensacola, Florida, this 22<u>nd</u> day of May 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**